Don Howarth (SBN 53783)
dhowarth@howarth-smith.com
Suzelle M. Smith (SBN 113992)
ssmith@howarth-smith.com
Jessica L. Rankin (SBN 279237)
jrankin@howarth-smith.com
HOWARTH & SMITH
523 West Sixth Street, Suite 728
Los Angeles, California, 90014
Telephone: (213) 955-9400
Facsimile: (213) 622-0791

Stephen M. Garcia (SBN 123338)
sgarcia@lawgarcia.com
David M. Medby (SBN 227401)
GARCIA, ARTIGLIERE & SCHADRACK
One World Trade Center, Suite 1950
Long Beach, California 90831
Telephone: (562) 216-5270
Facsimile: (562) 216-5271

David T. Kupfer (SBN 97666)
dave@dtklaw.net
LAW OFFICES OF DAVID T. KUPFER
24586 Hawthorne Boulevard, Suite 110
Torrance, California 90505
Telephone: (310) 373-7770
Facsimile: (310) 373-7778

Attorneys for Plaintiff, Lawrence VICARI, individually
and on behalf of all others similarly situated

FILED
CLERK, U.S. DISTRICT COURT

MAY − 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LAWRENCE VICARI, individually and
on behalf of all others similarly situated,

Plaintiffs,

vs.

VOYAGER FINANCIAL GROUP, LLC;
VFG, LLC; BRANDON KOGUT;
ANDREW GAMBER; BRITTNEY
MCCLINTON;

CAPTION CONTINUED ON NEXT
PAGE

CASE NO. CV13-00671 ABC (RZx)

Assigned:      Hon. Audrey B. Collins
Courtroom:     680

**CLASS ACTION**

**SECOND AMENDED COMPLAINT
FOR VIOLATION OF SECTION
10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED
THEREUNDER AGAINST VFG
DEFENDANTS AND VIOLATION
OF SECTION 20(a) OF THE
EXCHANGE ACT AGAINST VFG
CONTROL AND OFFICER
DEFENDANTS**

**DEMAND FOR JURY TRIAL**

1  JONATHAN SHEETS; MACKENZIE
2  YOUNG,

3              Defendants.

17  / / /
18  / / /
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

# INTRODUCTION

1.      Lead Plaintiff Lawrence Vicari brings this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of himself and all others similarly situated ("Class Members") against Voyager Financial Group LLC and/or VFG, LLC (collectively, "VFG"), and its officers and owners Brandon Kogut, Andrew Gamber, Brittney McClinton, Jonathan Sheets, and Mackenzie Young (collectively, "VFG Control and Officer Defendants" and, together with VFG, "VFG Defendants") for violation of the Federal Securities Laws in connection with the sale of securities in the form of structured payments, awards, and/or disability incomes owned by members of the United States military.

2.      Mr. Vicari, Lead Plaintiff, a resident of California, asserts these claims on behalf of himself and a class consisting of all persons and entities who were induced by VFG Defendants to purchase what are now known to be non-assignable government-funded pension and benefit payments during the Class Period and who were damaged thereby (the "Class" and "Class Members").

# NATURE OF THE ACTION

3.      This is a class action under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons who purchased or otherwise acquired securities in the form of structured payments, awards, pensions, and/or disability benefits and incomes ("Securities" or "Securities Contracts") owned by members of the United States military including, veterans ("Veterans" or "Military Retirees") sold by and through VFG Defendants and their agents throughout the United States between January 31, 2008 and January 31, 2013, inclusive (the "Class Period") and who were damaged thereby from the purchase of the Securities and losses incurred thereby.

4.      It is unlawful to sell such Securities, among other reasons, because 37 U.S.C. § 701 and/or 38 U.S.C. § 5301 prohibit the assignment of U.S. Government pensions and disability benefits.

*SECOND AMENDED COMPLAINT*

5.     VFG Defendants knew or should have known that the sales of the Securities were unlawful and that the Class Members, after paying the purchase price, would be unable to enforce the Securities Contracts and would lose their investments.

6.     During the Class Period and unbeknownst to Class Members, VFG Defendants (a) employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Class Members in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and (b) made untrue statements of fact or omissions of material fact that were misleading to Class Members in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  VFG Control and Officer Defendants acted as controlling persons of VFG within the meaning of § 20(a) of the Exchange Act as alleged herein.

**PARTIES**

7.     Defendant VFG is a limited liability company organized under the laws of Delaware with a principal place of business at 801 Technology Drive, Suite F, Little Rock, Arkansas 72223.  VFG facilitates transactions between buyers and sellers of income streams derived from assets that have fixed payment amounts and terms, such government retirement or military pension streams.

8.     Upon information and belief, Defendant Andrew Gamber is the managing member of VFG, from February 2012 to present.  He currently owns 100% of VFG, and has maintained an ownership interest of at least 32% at all times.  Upon information and belief, he resides within the United States.

9.     Upon information and belief, Defendant Jonathan Sheets was the managing member of VFG from September 19, 2001 until February 2012.  He held between 4% and 18% interests in VFG until June 2012.  Upon information and belief, he resides within the United States.

10.     Upon information and belief, Defendant Brandon Kogut is the Chief Officer of VFG.  Upon information and belief, he resides within the United States.

/ / /

2

11.     Upon information and belief, Defendant Brittney McClinton is the Director of Compliance for VFG.  Upon information and belief, she resides within the United States.

12.     Upon information and belief, Defendant Mackenzie Young is the Director of Case Management of VFG.  Upon information and belief, she resides within the United States.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act.

14.     Venue is proper in the Federal District Court for the Central District of California pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in Los Angeles County and VFG Defendants conduct business in Los Angeles County.  Lead Plaintiff Vicari purchased the Securities in California.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

## FACTS COMMON TO ALL CLAIMS

16.     VFG makes money by the sale of Securities in the form of contracts for the right to receive Veterans Administration and other military structured payments, awards, pensions and/or disability incomes owned by Veterans and Military Retirees throughout the United States ("Veterans Benefits" or "Veterans Benefits' Contracts").  These Veterans Benefits Contracts are Securities under the federal securities laws.  VFG Defendants have not registered these Securities with the federal government as is required and have not complied with federal law in connection with the sale of

3

1   Securities.  The Veterans Benefits are paid by the United States government to the
2   Veterans and are guaranteed to the Veterans.  These Veterans Benefits and the right
3   to the income from the Veterans' Benefits or Securities are sold by and through the
4   VFG Defendants to innocent investors ("Investors" or "Class Members") throughout
5   the United States by the VFG Defendants and their agents, including to Lead
6   Plaintiff.  VFG Defendants are agents of the Veterans.

7          17.    VFG Defendants' business practice includes finding individuals who are
8   receiving structured payments, pensions and/or disability incomes from the
9   government, and offering a lump sum in exchange for their promise to turn over all or
10  a portion of their payments, in the form of the Securities, which are investment
11  contracts.  These individuals, or "sellers," are often ex-military, injured during
12  service and in need of a large amount of money quickly.

13         18.    VFG investigates potential sellers to verify that their pensions or
14  disability income streams are the type of product that VFG sells.  VFG determines the
15  present value of the income stream and locates buyers to purchase the right to the
16  income stream for a lump sum payment.

17         19.    VFG enters into contracts with "sellers" which assign VFG the right to
18  sell the Securities once an investor is found.  The Investor, or "buyer", often retired,
19  is looking for a secure, risk free investment.  VFG Defendants use local agents
20  ("Selling Agents") to participate in the transactions and obtain money from the
21  Investors to pay a lump sum to the Veteran in exchange for a contract assigning the
22  rights to the Veterans' Benefits to the Class Member.

23         20.    Lead Plaintiff, Mr. Vicari, was such an investor.  Another such investor
24  is former Oregon Governor Neil Goldschmidt.

25         21.    VFG Defendants enter into contracts with the Veterans whereby the
26  VFG Defendants are given power of attorney for the Veterans.

27         22.    The Selling Agents sign virtually uniform agreements with VFG
28  Defendants to use their best efforts to recruit, promote, sell, and market the Securities

4

offered by VFG Defendants.  The Selling Agents receive a commission based on the number of Securities sold.  VFG gives the Selling Agents virtually uniform sales pitches to relay to Class Members and others to make the sales of the Securities.

23.     The Selling Agents act on behalf of VFG Defendants to market the Securities to the Class Members.  The Selling Agents' role was simply to identify potential investors and pass on information supplied by VFG Defendants about the Securities.

24.     VFG Defendants and their agents represent to the Veterans that this is a lawful transaction and that they have the right to sell their interests for a lump sum now and that their interests in the Veterans' Benefits will be paid to Class Members.

25.     VFG Defendants and their Selling Agents represented to the Investors and Class Members that the purchase of the Securities in the form of contracts for the right to military and Veterans Administration structured payments, awards, pensions, and/or disability incomes owned by Veterans throughout the United States, is lawful, risk free, is guaranteed as long as the United States government is solvent and stands, and will help Veterans, among other things.

26.     VFG Defendants assist Class Members to purchase the Securities.  The buyers and sellers do not communicate directly, only through VFG Defendants or their Selling Agents, as VFG Defendants direct.  All information and contracts are created by VFG Defendants and provided to the Class Members either directly or through the VFG Selling Agents.  All paperwork bears the VFG logo.  VFG Defendants had a duty to each Class Member to fully and truthfully inform and not to omit to inform each Class Member of the unlawful nature of the Securities VFG was selling.

27.     VFG Defendants gave the Selling Agents specific information that was to be communicated to the Class Members, including that this is a lawful transaction and that the Veterans have the right to sell their interests for a lump sum now and that the interests in the Veterans' Benefits will be paid to Class Members.  Such

5

1   representations were communicated through the Selling Agents to the Class

2   Members, as was intended by VFG Defendants.

3       28.     As part of the scheme to defraud Class Members, VFG Defendants set

4   up an escrow account in the name of the seller.  The seller consents to have his

5   Veterans Benefits paid into the escrow account.  VFG Defendants represent to the

6   Class Members that VFG Defendants control the escrow account and that the

7   Veteran's benefits will be paid directly into the escrow account, thereby securing the

8   investment return for the Class Members.   In fact, as the sale of Veteran's benefits is

9   illegal, payments to the Class Members from the escrow accounts as well as

10  payments into the escrow account are not enforceable.  VFG Defendants receive a

11  commission from these illegal transactions.

12      29.     Among the Selling Agents is Leonardo J. Bertucci, who contacted Lead

13  Plaintiff and acted as VFG's agent in connection with the sale of the Securities to

14  Lead Plaintiff.  *See* Declaration of Leonardo J. Bertucci, attached as Exhibit C hereto,

15  at ¶ 1.  Mr. Bertucci acted on behalf of VFG Defendants and communicated VFG

16  Defendant's representations to Lead Plaintiff, including that it was legal to market

17  and sell the Securities, that the Securities were secure because they were backed by

18  the U.S. government, and that there was little risk that the payments would stop once

19  the buyer purchased the Security.  *See id.* at ¶ 4.  On information and belief, VFG

20  Defendants have virtually the same arrangements with all Selling Agents.

21      30.     VFG Defendants knowingly and/or recklessly made misstatements

22  and/omissions of material facts ("Misrepresentations") when they knew or should

23  have known the truth.  These Misrepresentations include the following:

24          A.     Failure to disclose to the Class and concealment of the fact that

25                 U.S. government pensions and disability benefits may not be

26                 lawfully assigned, anticipated, or attached under 37 U.S.C. § 701

27                 and/or 38 U.S.C. § 5301, which prohibit the assignment of U.S.

28                 Government pensions and disability benefits;

6

B.  Failure to disclose to the Class and concealment of the fact that the payments owed by the Veterans cannot be lawfully or effectively secured to Lead Plaintiff or the Class Members;

C.  Misrepresenting that the sole risk of the investment was the solvency of the U.S. government;

D.  Misrepresenting that the Securities were risk free because VFG Defendants had legally enforceable power of attorney for all the Veterans and the ability to set up irrevocable escrow accounts to secure the investment for the Class Members;

E.  Failure to disclose and concealment of the fact that the Veterans may not assign their benefits and therefore may revoke their assignments at any time;

F.  Misrepresenting that the Securities were risk free when they were not and were in fact unlawful and therefore almost certain to fail; and

G.  Misrepresenting that the Securities transactions would benefit Veterans, when in fact VFG Defendants were inducing Veterans to enter into illegal sales of Securities to obtain money under false pretenses from innocent purchasers.

31.  Such Misstatements were misleading for the following reasons:

A.  U.S. government pensions and disability benefits may not be lawfully assigned, anticipated, or attached under 37 U.S.C. § 701 and/or 38 U.S.C. § 5301, which prohibit the assignment of U.S. Government pensions and disability benefits;

B.  Payments owed by the Veterans cannot be lawfully or effectively secured by the Lead Plaintiff or Class Members;

C.  The solvency of the U.S. government was not the only risk of the investment;

7

D.   VFG Defendants did not have enforceable power of attorney for each of the Veterans and did not have the legal right to enforce payments into the escrow accounts, rendering the Securities worthless;

E.   Veterans may not lawfully assign their benefits and may therefore revoke their assignments at any time;

F.   The Securities were not "risk free" because they were unlawful and certain to fail; and

G.   The Securities did not benefit Veterans and in fact induced Veterans to enter into unlawful contracts to obtain money under false pretenses from innocent purchasers.

32.   VFG Defendants knew or should have known that these statements were false when they were made to the Selling Agents and knew that the Selling Agents, as instructed by VFG Defendants, would in fact tell Class Members that the purchase of the Securities is lawful, risk free, is guaranteed as long as the United States government is solvent and stands, and will help Veterans.  VFG Defendants and their Selling Agents knew or should have known that Investors and Class Members will rely on the information provided by VFG Defendants in selling and purchasing the Securities.

33.   VFG Defendants induced Lead Plaintiff and the other Class Members to enter into such agreements and purchase of such Securities when they knew or should have known that the assignment of such government benefits is illegal including under 37 U.S.C. § 701 and/or 38 U.S.C. § 5301, which prohibit the assignment of U.S. Government pensions and disability benefits, facts which were unknown to the Class Members.  VFG Defendants knew that the sale of these Securities was not lawful, was not risk free, was not guaranteed to the Investor by the United States government, would not benefit Veterans and would in fact lead to loss of all of some of the Investors' money and gain to VFG Defendants.  VFG Defendants fraudulently

8

1    failed to disclose the true facts to Selling Agents, Veterans, Lead Plaintiff and the

2    other Class Members, in order to induce Class Members to purchase the Securities

3    and in order to benefit from the commissions resulting from the Securities.

4        34.    The misrepresentations and concealments on the part of the VFG

5    Defendants herein were part and parcel, and undertaken in conjunction with, a

6    scheme and device of drafting the agreements which execute the purchase of the

7    Securities to contain provisions which unlawfully and ineffectively attempt to evade

8    the application of 38 U.S.C. §5301 and/or 37 U.S.C. § 701 and deceive purchasers

9    into believing that the purchase of the Securities is valid and lawful.

10       35.    Despite VFG Defendants' knowledge that the Securities were illegal,

11   invalid, and/or unenforceable, VFG Defendants devised and engaged in a scheme and

12   course of conduct of intentionally and knowingly attempting to evade the application

13   of 38 U.S.C. §5301 and/or 37 U.S.C. § 701 to the sale and purchase of the Securities

14   and of intentionally deceiving purchasers into believing that transactions involving

15   the Securities were lawful, valid, safe, and secure when in fact they were not.

16       36.    This scheme and course of misconduct consisted of including provisions

17   within the documents that execute the sale and purchase of the Securities – including

18   but not limited to the "Sales Assistance Agreement" (Exhibit D attached hereto), the

19   "Contract for Sale of Payments" (Exhibit F hereto), and the "Purchase Assistance

20   Agreement" (Exhibit I hereto) (collectively the "Executing Documents") – which

21   intentionally, knowingly, and unlawfully attempt to contravene the provisions of 38

22   U.S.C. §5301 and/or 37 U.S.C. § 701 and which intentionally and knowingly attempt

23   to mislead Plaintiff and the Class Members into believing that the transactions

24   involving the Securities are lawful and valid when in fact they are not.

25       37.    The misleading provisions of the Executing Documents include, but are

26   not limited to, Section 10.2 through 10.4 of the "Contract for Sale of Payments"

27   (Exhibit F hereto).  VFG Defendants included language in the documents related to

28   the Securities, which states:

BOTH PARTIES INTEND THAT THE TRANSACTION(S) CONTEMPLATED BY THIS SALES ASSISTANCE AGREEMENT SHALL CONSTITUTE VALID SALE(S) OF PAYMENTS AND SHALL NOT CONSTITUTE IMPERMISSIBLE ASSIGNMENTS(S), TRANSFER(S), OR ALIENATION OF BENEFITS BY SELLER AS CONTEMPLATED BY APPLICABLE LAWS; HOWEVER CERTAIN RISKS EXIST.

BY EXECUTING THIS CONTRACT FOR SALE, BUYER AND SELLER SALES ASSISTANCE ACKNOWLEDGE AND AGREE THAT BUYER AND SELLER ARE AWARE OF AND EXPRESSLY ACCEPT ALL RISKS ASSOCIATED WITH THE TRANSACTION(S) CONTEMPLATED HEREIN.

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT VFG MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING WHETHER A COURT OF LAW WOULD INTERPRET THE TRANSACTION(S) CONTEMPLATED HEREIN AS INVALID ASSIGNMENT(S), TRANSFER(S) OR ALIENATION OF BENEFITS, OR OTHERWISE DEEM THE TRANSACTION INVALID.

38.     The "Sales Assistance Agreement" (Exhibit D hereto) and "Purchase Assistance Agreement" (Exhibit F hereto) include provisions that are identical and/or substantially similar to Section 10.2 through 10.4 of the "Contract for Sale of Payments," and which are also intentionally drafted and designed as unlawful and ineffective attempts to evade the provisions of 38 U.S.C. §5301 and/or 37 U.S.C. § 701 and mislead Lead Plaintiff and the Class Members into believing that the transactions involving the Securities were lawful and valid.

39.     Despite including these misleading provisions in the aforementioned documents, at all relevant times the VFG Defendants were fully aware that, notwithstanding the aforementioned misleading provisions in the Executing Documents, the sale and purchase of the Securities did in fact constitute impermissible assignments and alienation of Veterans' benefits in violation of applicable law.

40.     38 U.S.C. §5301 and/or 37 U.S.C. § 701 confer both a statutory right on private parties and affects the public interest.  The purpose of 38 U.S.C. §5301 and/or

10

1   37 U.S.C. § 701 is to protect not only the recipient of the benefits, but also "to insure

2   the public against the pauperism of the recipient of the benefits or that of his

3   dependents." *In re Flanagan*, 31 F. Supp. 402, 403 (D.D.C. 1940).

4       41.   The VFG Defendants' intentional and knowing attempt to contravene 38

5   U.S.C. §5301 through the inclusion of the aforementioned provisions within the

6   Executing Documents constitutes an unlawful and invalid attempt through a private

7   agreement to waive and release the statutory rights afforded by, and the purpose of, a

8   law established for a public reason.  A statutory right conferred on a private party but

9   also affecting public interest may not be waived or released by private agreement if

10  such waiver or release contravenes the statutory policy.  *See Brooklyn Sav. Bank v.*

11  *O'Neil*, 324 U.S. 697, 704 (1945) ("Where a private right is granted in the public

12  interest to effectuate a legislative policy, waiver of a right so charged or colored with

13  the public interest will not be allowed where it would thwart the legislative policy

14  which it was designed to effectuate.").

15      42.   The Plaintiff and the Class Members justifiably relied on the

16  aforementioned misleading provisions of the Executing Documents in believing that

17  purchases of Securities were valid and lawful, and in deciding to purchase the

18  Securities.

19      43.   As a direct result of Defendants unlawful and misleading scheme,

20  Plaintiff and the Class Members purchased the Securities and suffered damages as

21  alleged herein.

22      44.   In February 2011, VFG Defendants drafted a memo for circulation to the

23  Selling Agents, signed by VFG Defendant Jonathan Sheets.  The memo purported to

24  explain that the Securities did not violate federal law, because the transaction was an

25  assignment of a cash flow rather than a Pension or Veterans Benefit.  It also states

26  that the fact that the Veteran can revoke the consent to the escrow account is

27  "irrelevant."

28  / / /

45.    While including this misleading and false language in documents related to the Securities and given, directly or through Selling Agents, to Class Members, VFG Defendants and the Selling Agents informed Class Members that the sales of the Securities were lawful and risk free and did in fact make representations that the Securities were valid assignments.  VFG Defendants and the Selling Agents knew that buyers and sellers relied on their representations that the Securities were lawful and virtually risk free.  The attempted exculpatory language shows that VFG Defendants knew that the statements they made and had the Selling Agents make to the Class Members were in fact false.

46.    Through the use of the attempted exculpatory language in the contracts, VFG Defendants attempted to shield themselves from liability under the Securities laws and to mislead Lead Plaintiff and Class Members into believing that the Securities were lawful and valid because VFG Defendants knew that the Securities Contracts were unlawful and not "risk free."  VFG Defendants knew that the sale of the Securities violated federal securities law and would lead to the loss of the Class Member's investments because the Securities Contracts are unenforceable.  VFG Defendants intentionally and/or recklessly mislead Class Members into purchasing unlawful Securities and mislead Veterans and Selling Agents into participating in VFG Defendants unlawful scheme.  The purported exculpatory language VFG Defendants includes in the documents related to the Securities cannot shield it from its fraud in the sale of the Securities and constitutes an unlawful attempt to evade the provisions of 37 U.S.C. § 701 and/or 38 U.S.C. § 5301 by private agreement.

47.    As part of the fraudulent scheme, the Class Member sent the purchase money to VFG Defendants, which set up an escrow account to hold the purchase amount and make certain distributions and payments.  VFG Defendants receive a percentage commission of all sales at closing.

48.    As of August 20, 2012, VFG Defendants had completed approximately 317 sales in 31 states, totaling approximately $35,000,000 in purchases.  Upon

1   information and belief, multiple sales were made in California during the Class

2   Period and many more sales were made after August 2012.  On information and

3   belief, VFG Defendants are continuing their fraudulent scheme.

4       49.     On information and belief the VFG Defendants have engaged in devices,

5   schemes, and artifices to defraud and engaged in acts, practices, and a course of

6   business for the unlawful sale of unregistered Securities as is set forth herein.

7       50.     VFG Defendants' scheme did in fact lead to the loss of all or some of the

8   Class Members' money invested and to unlawful gain by VFG Defendants.  VFG

9   fraudulently failed to disclose the true facts to Plaintiff and the other Class Members.

10   Further, some of the payments, which the owner of the Veterans' Benefits cannot

11   lawfully assign, have now been stopped and cannot be lawfully or effectively secured

12   to Lead Plaintiff or the Class Members.

13      51.     VFG Defendants failed to disclose to Lead Plaintiff and the Class

14   Members that such contracts were illegal and irrevocable upon breach, were not risk

15   free, were not guaranteed to them by the United States government, and would not

16   help Veterans, who were also innocent and induced to enter into this unlawful scheme

17   to defraud innocent Investors of their money.

18      52.     VFG Defendants benefitted and received money from the sale of the

19   Securities.

20      53.     Lead Plaintiff has reason to believe that Defendant VFG fraudulently

21   induced a large number of investors across California and other States to purchase

22   Securities during the Class Period.

23      54.     VFG Control and Officer Defendants acted as controlling persons of

24   VFG.  By virtue of their high-level positions, and contractual rights, participation in

25   and/or awareness of VFG's operations and/or intimate knowledge of the statements

26   made by VFG, directly and through its agents and disseminated to the investing

27   public, Control and Officer Defendants had the power to influence and control and

28   did influence and control, directly or indirectly, the decision-making of VFG,

13

1    including the content and dissemination of the various statements that Lead Plaintiff

2    and the Class Members contend are false and misleading.

3        55.    Control and Officer Defendants were provided with or had unlimited

4    access to copies of the company's reports, press releases, public filings and other

5    statements made in connection with the sale of the Securities and alleged by Lead

6    Plaintiff and the Class Members to be misleading prior to and/or shortly after these

7    statements were issued and had the ability to prevent the issuance of the statements or

8    cause the statements to be corrected.

9        56.    During the Class Period, Control and Officer Defendants, as controlling

10   members of VFG, were privy to confidential and proprietary information concerning

11   VFG, its operations, finances, financial condition and present and future business

12   prospects. Because of their possession of such information, Control and Officer

13   Defendants knew or recklessly disregarded that the adverse facts specified herein had

14   not been disclosed to, and were being concealed from, the investing public and/or that

15   misrepresentations were being made in connection with the sale of the Securities,

16   including that the transactions were unlawful.

17       57.    VFG Defendants' actions and scheme have been found to be unlawful

18   under Arkansas law for the violation of the Arkansas Securities Act, codified at Ark.

19   Code Ann. §§ 23-42-101 through 23-42-509.  The Arkansas Securities Commissioner

20   has issued a Cease and Desist Order, which orders that VFG, Andrew Gamber, and

21   Jonathan Sheets, among others, must immediately cease and desist all activities in

22   Arkansas in connection with the sale of Securities.  A copy of the Cease and Desist

23   Order and the Press Release accompanying it are attached as Exhibit A and Exhibit B

24   hereto, respectively.

25                              **CLASS ACTION ALLEGATIONS**

26       58.    Lead Plaintiff brings this action as a class action pursuant to Federal

27   Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons

28   and entities who purchased or otherwise acquired Securities during the Class Period

1  and who were damaged thereby. Excluded from the Class are (i) Defendants; (ii) all

2  officers, directors, and partners of any Defendant and of any Defendant's

3  partnerships, subsidiaries, or affiliates, at all relevant times; (iii) members of the

4  immediate family of any of the foregoing excluded parties; (iv) the legal

5  representatives, heirs, successors, and assigns of any of the foregoing excluded

6  parties; and (v) any entity in which any of the foregoing excluded parties has or had a

7  controlling interest.

8      59.    The members of the Class are so numerous that joinder all of members is

9  impracticable. On information and belief there are more than 300 Class Members.

10  Throughout the Class Period, VFG Defendants were actively engaged in inducing the

11  completion of numerous investment contracts between Veterans and Class Members,

12  which are Securities. While the exact number of Class Members is unknown to Lead

13  Plaintiff at this time and can only be ascertained through appropriate discovery, Lead

14  Plaintiff believes that there are numerous members in the proposed Class, more than

15  300 have been identified by the Arkansas Securities Commission in its Cease and

16  Desist Order. *See* Exhibit A hereto. Record owners and other members of the Class

17  may be identified from records maintained by VFG Defendants or its agents and may

18  be notified of the pendency of this action by mail, using the form of notice similar to

19  that customarily used in securities class actions.

20      60.    Lead Plaintiff's claims are typical of the claims of the members of the

21  Class as all members of the Class are similarly affected by Defendants' wrongful

22  conduct in violation of federal law complained of herein.

23      61.    Lead Plaintiff will fairly and adequately protect the interests of the

24  members of the Class and has retained counsel competent and experienced in class

25  and securities litigation.

26      62.    Common questions of law and fact exist as to all members of the Class

27  and predominate over any questions solely affecting individual members of the Class.

28  / / /

63.    Among the questions of law and fact common to the Class are:

    A.    Whether the federal securities laws were violated by VFG Defendants' acts as alleged herein;

    B.    Whether VFG Defendants employed devices, schemes, artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Class Members.

    C.    Whether omissions and/or statements made by VFG Defendants directly or through its agents to potential investors and Class Members during the Class Period misrepresented material facts about the Securities in the sale of Securities; and

    D.    To what extent the members of the Class have sustained damages and the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members, while significant to them, may be too small to justify the expense of individual cases, and the expense and burden of individual litigation may make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE CLASS IS ENTITLED TO A PRESUMPTION OF RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER THE FRAUD ON THE MARKET DOCTRINE

65.    In addition to actual reliance, the Class is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against VFG Defendants include omissions of material fact of which there was a duty to disclose.

/ / /

66.     Also, the Class is entitled to a presumption of reliance under the fraud on the market doctrine based on VFG Defendants' material misrepresentations and omissions because:

A.     Lead Plaintiff and other Investors and Class Members were assured by VFG Defendants that the value of the Securities would be negatively affected only by government default on its pension and disability payments;

B.     VFG Defendants directly and through their agents knowingly failed to disclose information on the illegality of the contracts they were selling;

C.     VFG Defendants directly and through their agents affirmatively represented that the sale and purchase of the Securities was lawful;

D.     VFG Defendants directly and through their agents affirmatively represented that the sale and purchase of the Securities would help Veterans;

E.     VFG Defendants directly and through their agents affirmatively represented that the sale and purchase of the Securities was risk free;

F.     VFG Defendants directly and through their agents made such misrepresentations publicly available through the use of various websites created to generate business;

G.     The material misrepresentations and omissions alleged herein would tend to and did induce reasonable investors, such as the Class Members, to misjudge the value and integrity of the securities; and

H.     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class

17

1   purchased these securities between the time VFG Defendants and

2   their agents misrepresented or failed to disclose material facts and

3   the time the true facts were disclosed.

4   67.   The fraud on the market doctrine "provides a presumption that a plaintiff

5   who buys or sells stock at the price set by the market does so in reliance on the

6   integrity of that price, which, in turn, depends on the accuracy of the publicly

7   available information." *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 312 (E.D.

8   Va. 2007).

9   68.   VFG Defendants circulated inaccurate and misleading information about

10  the Securities through the use of publicly available websites and spreadsheets with

11  details about available deals to induce Lead Plaintiff and the Class to enter into illegal

12  and irrevocable investment contracts.  *See* Pension 4 Cash,

13  http://www.pension4cash.com (last visited January 30, 2013).

14  **FIRST CAUSE OF ACTION**

15  **Securities Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-**

16  **5(a) and (c) Promulgated Thereunder**

17  **Scheme Liability**

18  **(Against VFG Defendants)**

19  69.   Lead Plaintiff and the Class Members incorporate fully all allegations in

20  Paragraphs 1 to 68 as if fully set forth herein.

21  70.   Lead Plaintiff and the Class Members assert this Count against VFG

22  Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

23  10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

24  71.   The sale of the Securities constituted a sale of securities under Section

25  10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-

26  5, promulgated thereunder.  The securities sale took place in and affected interstate

27  commerce.

28  */ / /*

18

72.     As alleged in more detail *supra*, in connection with the sale of the Securities, VFG Defendants carried out a plan, scheme, and course of conduct which was intended to and did deceive Lead Plaintiff and Class Members into investing in the Securities which were unlawful and certain to lead to the loss of some or all of their investments.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

73.     As described above, Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiff and Class Members in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

74.     VFG Defendants induced Lead Plaintiff and Class Members to purchase the Securities in order to obtain a commission on each sale made.  As a result, Lead Plaintiff and Class Members invested in Securities which were unlawful and worthless once the Veterans were unable to continue making payments on the Securities.  VFG Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which was intended to induce Lead Plaintiff and Class Members to purchase the Securities, which resulted in the loss of some or all of Lead Plaintiff and Class Member's investment.

75.     The misrepresentations and concealments on the part of the VFG Defendants hereinabove were part and parcel, and undertaken in conjunction with, a scheme and course of business of designing and drafting the documents which effectuate the purchase of the Securities to contain provisions which attempt to avoid the application of 38 U.S.C. §5301 and/or 37 U.S.C. § 701 and deceive purchasers into believing that the purchase of the Securities is valid and lawful.

76.     Despite VFG Defendant's knowledge that the Securities were illegal, invalid, and unenforceable, VFG Defendants devised and engaged in a scheme and course of conduct to intentionally avoid the application of 38 U.S.C. §5301 and/or 37

/ / /

1    U.S.C. § 701 and deceive purchasers into believing that the Securities were lawful,

2    valid, safe, and secure when in fact they were not.

3        77.    VFG Defendants executed this scheme and course of misconduct by

4    including misleading provisions in the Executing Documents which were designed as

5    unlawful attempts to evade the provisions of 38 U.S.C. §5301 and/or 37 U.S.C. § 701

6    and mislead Lead Plaintiff and Class Members into believing that the Securities were

7    lawful and valid.

8        78.    38 U.S.C. §5301 and/or 37 U.S.C. § 701 confer both a statutory right on

9    private parties and affects the public interest.  The purpose of 38 U.S.C. §5301 and/or

10   37 U.S.C. § 701 is to protect not only the recipient of the benefits, but also "to insure

11   the public against the pauperism of the recipient of the benefits or that of his

12   dependents." *In re Flanagan*, 31 F. Supp. 402, 403 (D.D.C. 1940).

13       79.    VFG Defendants attempt to contravene 38 U.S.C. §5301 and/or 37

14   U.S.C. § 701  by including misleading provisions in the Executing Documents

15   constitutes an unlawful and invalid attempt by private agreement to waive and release

16   the statutory rights afforded by, and the purpose of, a law established for a public

17   reason.

18       80.    Lead Plaintiff and Class Members actually and justifiably relied on the

19   aforementioned misleading provisions of the Executing Documents in believing that

20   the Securities were valid and lawful, and in purchasing the Securities.

21       81.    As a direct and proximate result of VFG Defendants' conduct, Lead

22   Plaintiff and Class Members have suffered damages in an amount to be determined at

23   trial.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

SECOND AMENDED COMPLAINT

## SECOND CAUSE OF ACTION

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated**

**Thereunder**

**Material Misstatements and Omissions**

**(Against VFG Defendants)**

82.     Lead Plaintiff and the Class Members incorporate fully all allegations in Paragraphs 1 to 81 as if fully set forth herein.

83.     Lead Plaintiff and the Class Members assert this Count against VFG Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

84.     The sale of the Securities constituted a sale of securities under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The securities sale took place in and affected interstate commerce.

85.     As alleged in more detail *supra*, in connection with the sale of the Securities, VFG Defendants made material misstatements and omissions of fact which were intended to and did deceive Lead Plaintiff and Class Members into purchasing the Securities which were unlawful and worthless.

86.     VFG Defendants represented to Class Members that this was a lawful transaction and that the Veterans have the right to sell their interests for a lump sum now and that the interests in the Veterans' Benefits will be paid to Class Members.

87.     VFG Defendants and/or their agents: (1) recklessly, knowingly, and/or with an intent to defraud made a misstatement and/or an omission of material fact, when they knew or should have known the truth; (2) made misstatements and/or omissions in connection with the purchase or sale of the Securities; (3) intended and knew the Lead Plaintiff and Class Members relied on the misrepresentations and/or that VFG Defendants and/or their agents had disclosed all material facts and information and not omitted to disclose material information in purchasing the

21

1   Securities; and (4) caused Lead Plaintiff's and the Class Members injury and

2   economic loss.

3       88.   VFG Defendants and their agents made material misrepresentations and

4   omissions of fact which deceived the investing public including Lead Plaintiff and

5   other Class Members.  Untrue and misleading statements include the following:

6       A.   Failure to disclose to the Class and concealment of the fact that

7            U.S. government pensions and disability benefits may not be

8            lawfully assigned, anticipated, or attached under 37 U.S.C. § 701

9            and/or 38 U.S.C. § 5301, which prohibit the assignment of U.S.

10           Government pensions and disability benefits;

11      B.   Failure to disclose to the Class and concealment of the fact that

12           the payments owed by the Veterans cannot be lawfully or

13           effectively secured to Lead Plaintiff or the Class Members;

14      C.   Misrepresenting that the sole risk of the investment was the

15           solvency of the U.S. government;

16      D.   Misrepresenting that the Securities were risk free because VFG

17           Defendants had legally enforceable power of attorney for all the

18           Veterans and the ability to set up irrevocable escrow accounts to

19           secure the investment for the Class Members;

20      E.   Failure to disclose and concealment of the fact that the Veterans

21           may not assign their benefits and therefore may revoke their

22           assignments at any time;

23      F.   Misrepresenting that the Securities were risk free when they were

24           not and were in fact unlawful and therefore almost certain to fail;

25           and

26      G.   Misrepresenting that the Securities transactions would benefit

27           Veterans, when in fact VFG Defendants were inducing Veterans

28   / / /

H.     to enter into illegal sales of Securities to obtain money under false pretenses from innocent purchasers.

89.     VFG Defendants made money from the sale of the illegal Securities in the form of a commission on each sale made.

90.     As a direct and proximate result of VFG Defendants' material omissions, Lead Plaintiff and Class Members have suffered substantial damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act

### (Against VFG Control and Officer Defendants)

91.     Lead Plaintiff and the Class Members incorporate fully all allegations in Paragraphs 1 to 90 as if fully set forth herein.

92.     Lead Plaintiff and the Class Members assert this Count against VFG Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

93.     Upon information and belief, Defendant Andrew Gamber is the managing member of VFG, from February 2012 to present.  He currently owns 100% of VFG, and has maintained an ownership interest of at least 32% at all times.  Upon information and belief, he resides in the United States.  By virtue of his position as a managing member of VFG, he had the power to control and influence VFG, and he exercised a significant degree of day-to-day operational control over VFG, including but not limited to VFG's financial operations.

94.     Upon information and belief, Defendant Jonathan Sheets was the managing member of VFG from September 19, 2001 until February 2012.  He held between 4% and 18% interests in VFG until June 2012.  Upon information and belief, he resides in the United States.  By virtue of his position as a managing member of VFG, he had the power to control and influence VFG, and he exercised a significant degree of day-to-day operational control over VFG, including but not limited to VFG's financial operations.

95.     Upon information and belief, Defendant Brandon Kogut is the Chief Officer of VFG.  Upon information and belief, he resides in the United States.  By virtue of his position as a managing member of VFG, he had the power to control and influence VFG, and he exercised a significant degree of day-to-day operational control over VFG, including but not limited to VFG's financial operations.

96.     Upon information and belief, Defendant Brittney McClinton is the Director of Compliance for VFG.  Upon information and belief, she resides in the United States.  By virtue of her position as a managing member of VFG, she had the power to control and influence VFG, and she exercised a significant degree of day-to-day operational control over VFG, including but not limited to VFG's financial operations.

97.     Upon information and belief, Defendant Mackenzie Young is the Director of Case Management of VFG.   Upon information and belief, she resides in the United States.  By virtue of her position as a managing member of VFG, she had the power to control and influence VFG, and she exercised a significant degree of day-to-day operational control over VFG, including but not limited to VFG's financial operations.

98.     Upon information and belief, this Court may exercise jurisdiction over the VFG Control and Officer Defendants because they have minimum contacts with the United States.

99.     As alleged in more detail *supra*, VFG Control and Officer Defendants carried out a plan, scheme, and course of conduct which deceived Lead Plaintiff and Class Members into purchasing the Securities, which were unlawful and worthless, and made material representations and omissions of material fact which mislead Lead Plaintiff and Class Members into believing that the Securities were risk free, safe investments that would help Veterans.  The facts alleged herein establish VFG Control and Officer Defendants' primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

24

1    100.   VFG Control and Officer Defendants acted as controlling persons of

2    VFG within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue

3    of their high-level positions, and contractual rights, participation in and/or awareness

4    of VFG's operations and/or intimate knowledge of the statements made by VFG,

5    directly and through its agents and disseminated to the investing public, Control and

6    Officer Defendants had the power to influence and control and did influence and

7    control, directly or indirectly, the decision-making of VFG, including the content and

8    dissemination of the various statements that Lead Plaintiff and the Class Members

9    contend are false and misleading.

10    101.   Control and Officer Defendants were provided with or had unlimited

11    access to copies of the company's reports, press releases, public filings and other

12    statements made in connection with the sale of the Securities and alleged by Lead

13    Plaintiff and the Class Members to be misleading prior to and/or shortly after these

14    statements were issued and had the ability to prevent the issuance of the statements or

15    cause the statements to be corrected.

16    102.   During the Class Period, Control and Officer Defendants, as controlling

17    members of VFG, were privy to confidential and proprietary information concerning

18    VFG, its operations, finances, financial condition and present and future business

19    prospects. Because of their possession of such information, Control and Officer

20    Defendants knew or recklessly disregarded that the adverse facts specified herein had

21    not been disclosed to, and were being concealed from, the investing public and/or that

22    misrepresentations were being made in connection with the sale of the Securities,

23    including that the transactions were unlawful.

24    103.   Control and Officer Defendants are thus liable as direct participants in

25    the wrongs complained of herein.  In addition, they were "controlling persons" within

26    the meaning of §20(a) of the Exchange Act and had the power and influence to cause

27    VFG to engage in the unlawful conduct complained of herein.  Control and Officer

28    Defendants are liable as participants in a fraudulent scheme and course of conduct

1  that operated as a fraud or deceit on purchasers of the Securities by disseminating

2  materially false and misleading statements and/or concealing material adverse facts.

3      104.   As a direct and proximate result of VFG Control and Officer

4  Defendants' wrongful conduct, Lead Plaintiff and Class Members have suffered

5  substantial damages in an amount to be determined at trial.

6  ## **PRAYER**

7      **WHEREFORE**, Lead Plaintiff and the Class Members pray for relief, and

8  judgment, and Court orders as follows:

9      1.   Determining that this action is a proper class action under Rule 23 of the

10          Federal Rules of Civil Procedure;

11     2.   Awarding compensatory damages in favor of Lead Plaintiff and the

12          Class Members against all VFG Defendants, jointly and severally, for all

13          damages sustained as a result of VFG Defendants' wrongdoing, in an

14          amount to be proven at trial, including interest thereon;

15     3.   Awarding Lead Plaintiff and the Class Members their reasonable costs

16          and expenses incurred in this action, including class counsel fees and

17          expert fees; and

18     4.   Such other and further relief as the Court may deem just and proper.

19

20  Dated:  May 8, 2013                    HOWARTH & SMITH

21

22                              By:   /s/Suzelle M. Smith
                                      Suzelle M. Smith

23                                    Attorneys for Lead Plaintiff
                                      Lawrence VICARI and CLASS

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

## <u>JURY TRIAL DEMANDED</u>

2

Lead Plaintiff and the Class Members hereby demand a trial by jury.

3

4

Dated:  May 8, 2013                          HOWARTH & SMITH

5

By:   /s/Suzelle M. Smith
         Suzelle M. Smith

6

7

Attorneys for Lead Plaintiff
Lawrence VICARI and CLASS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

RECEIVED

13 APR 22 AM 10:58

BEFORE THE ARKANSAS SECURITIES COMMISSIONER ARKANSAS SECURITIES DEPT.
Case No. S-12-0015
Order No. S-12-0015-13-OR02

---

IN THE MATTER OF
VFG, LLC f/k/a
VOYAGER FINANCIAL GROUP, LLC,
ANDREW GAMBER, KEVIN MCNAY,
ROBERT HENRY, and
JONATHAN SHEETS                                              RESPONDENTS

---

## CEASE AND DESIST ORDER

On April 22, 2013, the Staff of the Arkansas Securities Department ("Staff") filed its

Request for a Cease and Desist Order ("Request"). In its Request, the Staff states that it has

received information and has in its possession certain evidence which indicates that VFG, LLC

f/k/a Voyager Financial Group, LLC ("VFG") , Andrew Gamber ("Gamber"), Kevin McNay

("McNay"), Robert Henry ("Henry") and Jonathan Sheets ("Sheets") (collectively

"Respondents") have violated provisions of the Arkansas Securities Act ("Act"), codified at Ark.

Code Ann. §§ 23-42-101 through 23-42-509. The Arkansas Securities Commissioner

("Commissioner") has reviewed the Request and based upon the representations made therein

finds that:

### FINDINGS OF FACTS

The Request contains the following representation of fact:

1. VFG is a Delaware limited liability company ("LLC") registered to do business in

   Arkansas with its principal place of business located at 801 Technology Drive, Suite F,

   Little Rock, Arkansas 72223.

2. Gamber is currently the managing member of VFG, owning 100% of the company as of

February 20, 2013.  At all times referenced herein, Gamber held at least a 32% interest in VFG.  Gamber has been the managing member since February 28, 2012.

3.  From on or about May 21, 2010, to on or about February 28, 2012, McNay owned at least a 32% interest and up to a 47.06% interest in VFG.

4.  From on or about May 21, 2010, to on or about August 31, 2011, Henry owned at least a 32% interest in VFG.

5.  Upon information and belief, Sheets was the managing member of VFG from September 19, 2011, until some point in 2012, and owned from 4% to 18% interests in VFG from 2011 to June 2012.

6.  An individual who wants to sell his or her income stream ("seller") appoints VFG as an authorized "buying agent" to submit a contingent offer to a third-party buyer ("buyer").

7.  VFG facilitates transactions between buyers and sellers of income streams derived from assets that have fixed payment amounts and terms, such as retirement or military pension streams.

8.  VFG is contacted by potential sellers.  VFG vets potential sellers to verify their pension stream is the type of product VFG sells.  VFG determines the present value of the income streams and sells the streams to interested buyers through agents VFG labels as independent contractors.

9.  VFG submits an offer sheet to the buyer through one of its agents.  The purchase price is payable to VFG.  VFG assists sellers through the process of selling their income stream.  They provide a checklist to the seller of everything necessary to facilitate the sale.  If information is incomplete, VFG works with the seller to gather all required information.

Page 2

Exhibit A
Page 29

One of the items required by VFG is a credit report from the seller to verify that there are no liens on the income stream. VFG also requires verification from the seller's pension company verifying that the seller is entitled to receive a pension, as well as the terms of the pension disbursement including the monthly amount of the income stream.

10. VFG provides the potential buyer with a "closing book" comprised of all the information gathered from the seller regarding the income stream. As represented by VFG, the information contained therein is "all of the information that the [b]uyer needs to make an informed decision on whether to follow through with the purchase." The buyer and seller do not directly communicate during this process. All information and contracts are provided by VFG. All paperwork bears the VFG logo. Furthermore, counsel for VFG encouraged an agent to complete most of the paperwork so buyers only were required to sign the paperwork.

11. If a buyer wants to purchase the income stream, VFG provides the buyer with a purchase application, and VFG accepts the offer to purchase on behalf of the seller. If the buyer backs out of the deal, VFG places the income stream back into an active inventory to be sold. VFG keeps track of and updates inventory lists to forward to agents to sell to buyers.

12. Once an income stream is purchased, the buyer then forwards the purchase-price amount to VFG which sets up an escrow account to hold that amount and make certain distributions and payments.

13. The buyer does not acquire title or ownership of the underlying asset that provides the income stream but acquires a contractual right to receive the income stream from the

Exhibit A
Page 30

annuity or pension.

14. Once the seller assigns the right to receive the income stream to the buyer, the seller creates an escrow account in his or her name and control. The seller grants the escrow company a special, durable power of attorney enabling the escrow company to manage that account and the income-stream funds received. VFG works with the buyer to instruct the escrow company to direct payments of a monthly amount to the buyer for the term agreed upon at the time of sale.

15. The buyer has the option for VFG to facilitate payments of premiums for a life insurance policy on the seller of the income stream because the income streams are life contingent. Further, the buyer has the option to purchase a two-year contestability wrapper through VFG. VFG then coordinates the purchase of the life insurance policies and collateral assignments of pre-existing life insurance policies.

16. Because the buyer does not acquire title or ownership of the underlying asset that provides the income stream, a seller can redirect the stream back to the seller at any time, leaving the buyer with only a legal claim. VFG monitors the investment to assist the buyer if needed and offers its services in identifying why the buyer is no longer receiving the income-stream payments. As part of this service, VFG offers to advance one-month's payment under the income-stream-purchase contract until the issue can be resolved. If the issue cannot be resolved within the one-month timeframe, VFG offers to provide other options to the buyer at that time. For at least one buyer who was no longer receiving income-stream payments, VFG offered to make payments for up to six months while attempting to locate the seller. Through a promissory note with the same rate of

interest as the income stream, VFG offered the option to purchase the income stream back from this buyer at any point during the six months for the original purchase price less the income received by the buyer. For other buyers, VFG offers the services of Buttonwood Insurance Services and Upstate Law Group to attempt remediation.

17. VFG drafts all of the required paperwork and facilitates the execution of the contracts and agreements by involved parties. Additionally, VFG receives a percentage commission from all sales at closing.

18. The agents sign an agreement with VFG ("Agreement") to use their best efforts to recruit, promote, sell, and market products and services offered by VFG. Some agents are given a website to use to promote the product and obtain interested buyers ( "website"). According to the Agreement, VFG provides website support and pays fees associated with website development during a preliminary period, which is reimbursed out of the agent's commission fee. Once website fees are reimbursed to VFG and after the preliminary period, the agent will begin to receive a full-percentage commission based upon 90% of the total profit from the sales of the income streams.

19. Pursuant to the Agreement, VFG requires the agents to quote a minimum of fifteen cases per week and average about five purchases a week to justify use of the website. Further, agents are required to drive traffic to the website with "organic links." The agreement further states that agents are given a period of six weeks to reach the quoting-average and purchase-average requirements. The averages are calculated on a six-week basis and subject to a review. The website remains the property of VFG, and VFG retains the right to revoke permission or access to the website being used by agents for any reason.

Page 5

Exhibit A
Page 32

20. As of August 20, 2012, VFG had facilitated approximately 317 sales in 31 states for an estimated total of $34,245,351.48 and received an estimated $6,724,049.71 in commissions. VFG paid additional commissions to an estimated eighty-one agents between February 2011 and July 2012. Multiple sales were made to two Arkansas residents during that time. Upon information and belief, VFG currently is facilitating sales and collecting commissions from transactions across the country.

21. A search of the records of the Arkansas Securities Department ("Department") shows that VFG has never registered or filed a proof of exemption in accordance with the Act and has never notice filed in accordance with federal law in connection with a covered security for offers and sales of securities in Arkansas.

## CONCLUSIONS OF LAW

22. Ark. Code Ann. § 23-42-102(15)(A)(xi) defines investment contracts as securities. The Act was promulgated to protect investors, and it utilizes a broad definition of securities to determine which transactions are subject to the Act. *Carder v. Burrow*, 940 S.W.2d 429, 431 (Ark. 1997) (citing *Schultz v. Rector-Phillips-Morse, Inc.*, 552 S.W.2d 4, 8 (Ark. 1977)). In *Schultz*, the Court held that the definition of a security under the Act should not be given a narrow construction but that "it is better to determine in each instance from a review of all the facts, whether an investment scheme or plan constitutes an investment contract… within the scope of the statute." 552 S.W.2d at 10.

23. Arkansas recognizes transactions as investment contracts if they meet the five-prong risk capital test set out in *Smith v. State*, 587 S.W.2d 50 (Ark. Ct. App. 1979). The five elements of the risk capital test are "(1) the investment of money or money's worth; (2)

Page 6

Exhibit A
Page 33

investment in a venture; (3) the expectation of some benefit to the investor as a result of the investment; (4) contribution towards the risk capital of the venture; and (5) the absence of direct control over the investment or policy decisions concerning the venture." *Id.* at 52. Furthermore, the United States Supreme Court has defined an investment contract as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

24. In *Grand Prairie Sav. and Loan Ass'n, Stuttgart v. Worthen Bank and Trust Co., N.A.*, 769 S.W.2d 20, 22 (Ark. 1989), the Arkansas Supreme Court noted that the *Smith* test is substantially the same test used in the federal courts and cited *Union Nat'l Bank v. Farmers Bank*, 786 F.2d 881 (8th Cir. 1986), involving two Arkansas banks and applying the *Howey* test in its analysis. However, as highlighted in *Schultz*, the Court rejected an express adoption of this federal test in favor of a more flexible case-by-case analysis, 552 S.W.2d at 10.

25. The *Smith* risk capital test requires an investment in a venture, whereas the *Howey* test requires an investment in a common enterprise. A venture is defined as an "undertaking that involves risk[.]" *Black's Law Dictionary* 1695 (9th ed. 2009). Under the risk capital test, the term venture is used in the ordinary sense of an "undertaking" and there need only be one investor for a security with no requirement for a venture to include multiple pooled investors. Frances S. Fendler, *Private Placements and Limited Offerings of Securities A Guide for the Arkansas Practioner* § 3.2[2][B] (2010) (*citing* Joseph C. Long, *An Attempt to Return "Investment Contracts" to the Mainstream of Securities*

Page 7

Exhibit A
Page 34

*Regulation*, 24 OKLA. L. REV. 135, § 2:86.4 (1971)).  The subject transactions satisfy an investment in a venture.  Buyers undertake the risk of not receiving income-stream payments when purchasing an income stream.  Buyers who purchase the income-stream products pay money to receive a fixed return for a period of time.  The buyers purchase the income streams for a certain sum of money as determined by VFG.  Therefore, the buyers invest money in a venture with an expectation of the benefit of a fixed return with the risk of the seller redirecting the income stream.

26. In 1997 in *Carder v. Burrow*, the Arkansas Supreme Court applied the risk capital test, and focused on the element requiring the "expectation of some benefit" to analyze whether an instrument was a security. *Carder*, 940 S.W.2d at 431.  The *Carder* Court cited the Eighth Circuit case of *First Fin. Fed. Sav. & Loan Ass'n. v. E. F. Hutton Mortgage Corp.*, 834 F.2d 685 (8th Cir. 1987), which analyzed Arkansas law and stated that an expectation of benefit as contemplated by *Smith v. State* is not met by a fixed rate of interest because there was no "opportunity for either capital appreciation or participation" in the company's profits. *Id.* at 689.  However, the United States Supreme Court ruled in *SEC v. Edwards*, 540 U.S. 389 (2004), that investment schemes offering contractual entitlement to a fixed rate of return could be investment contracts. *Id.* at 394. The Court further stated that investments "pitched as low-risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud...." *Id.* at 394 (citing 2 S.Rep. No. 102-261, App., p. 326 (1992) (Staff Summary of Federal Trade Commission Activities Affecting Older Consumers)). Additionally, the Court stated that there was no reason to distinguish between promises of

Page 8

Exhibit A
Page 35

variable returns and promises of fixed returns. *Edwards*, 540 U.S. at 394. Therefore, the requirement of an expectation of some benefit is satisfied because buyers expect to receive a fixed return upon purchasing an income stream.

27. As required by the *Smith* risk capital test, the buyers contribute to the risk capital of the venture by paying money to receive the income-stream payments that are reassigned from the original owner and seller to the buyer for a period of time. The purchase price is then redistributed to the agents and VFG to pay commissions, with the remaining balance going to the seller. The full amount of the purchase price is not forwarded directly to the seller. Money is first paid in the form of commissions to VFG and its agents before a lesser amount is forwarded to the seller. The buyer is then at risk of the income streams being improperly redirected to the seller without the intervention of VFG to make sure everything functions as it should.

28. Additionally, the final requirement of *Smith* is satisfied, as there is an absence of direct control over the investment as well as an absence of control over policy decisions concerning the venture. VFG connects the buyers and sellers who would not otherwise transact business, if not for VFG's coordination and involvement in the venture. Although a contract dictates that the income stream is assigned to the buyer, the buyer has no actual control over the income stream. If the income stream is redirected and the buyer is no longer receiving the income, VFG steps in, contacts the seller to determine the problem, and tries to remedy the problem for the buyer. VFG reaches out to the seller and relays information back to the buyer. One buyer stated that there was never direct involvement with the seller throughout the income-stream transaction. VFG and its

Page 9

Exhibit A
Page 36

agents facilitated all contact and transactions. In addition, all paperwork between the buyer and seller is on VFG letterhead and is reviewed by VFG. VFG vets the seller and verifies that the information provided by the seller is correct. VFG verifies that there is actually a pension income stream and receives a credit report from the seller to ensure there are no liens on the income stream. Additionally, VFG determines the value of the income stream. Examining the totality of VFG's responsibilities and efforts, the return generated to the buyer depends on VFG's managerial skills in conducting pre-closing investigations and analyses, verifying all information is in place, verifying that there is a life insurance policy either purchased or collaterally assigned in case of the death of the seller, and providing all necessary paperwork to the buyers and sellers to facilitate the transaction.

29. Considering the totality of the program offered by Respondents, the transactions described herein are investment contracts pursuant to the risk capital test. As Ark. Code Ann. § 23-42-102(15)(A)(xi) defines investment contracts as securities, the transactions described herein are securities.

30. VFG would be considered a person pursuant to the Act as Ark. Code Ann. § 23-42-102(11) defines person as an individual or a LLC among other things.

31. Rule 102.01(11)(A) and (B) of the Rules of the Arkansas Securities Commissioner ("Rules") presumes control of a person when any individual is a director, partner or officer exercising executive responsibility or has a similar status or performs similar functions or directly or indirectly has the right to vote 25% or more of the voting securities of a person. Gamber, McNay, Henry, and Sheets would be considered to be in

Page 10

Exhibit A
Page 37

control of VFG. Gamber is the managing member of VFG and currently owns 100% of VFG and has owned at least a 32% interest in VFG during all times referenced herein. From May 21, 2010, to February 28, 2012, McNay owned at least a 32% interest and up to a 47.06% interest during that time. Henry owned at least a 32% interest in VFG from May 21, 2010, to August 31, 2011. Sheets represented that he was the managing member of VFG from September 19, 2011, until Gamber became managing member at some point in 2012.

32. Ark. Code Ann. § 23-42-501 provides that it is unlawful for any person to offer or sell any security in this state which is not registered or which is not exempt from registration under the terms of the Act.

33. Pursuant to Ark. Code Ann. § 23-42-103(a)(3), an offer to sell or to buy is made in this state when the offer originates from this state.

34. The facts set out above in paragraphs two through twenty-one illustrate that the Respondents offered and sold unregistered securities in violation of Ark. Code Ann. § 23-42-501.

35. Ark. Code Ann. § 23-42-209(a)(1)(A) provides that whenever it appears to the Commissioner upon sufficient grounds or evidence satisfactory to the Commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of the Act, the Commissioner may summarily order the person to cease and desist from the act or practice. Respondents have engaged in conduct that violates the Act. Based upon the seriousness of the violations and the remedial function to be served by this Cease and Desist Order, this Cease and Desist Order is in the public

Exhibit A
Page 38

interest and appropriate.

36. The seriousness of the violations described above should not be taken lightly as violations of Ark. Code Ann. § 23-42-501 can give rise to civil liability under Ark. Code Ann. § 23-42-106.

37. The Commissioner is empowered by Ark. Code Ann. § 23-42-205(a) to make any public or private investigations within or outside of Arkansas which he deems necessary to determine whether any person has violated or is about to violate any provision of the Act or any rule or order issued or promulgated under the Act or to aid in the enforcement of the Act. Based upon the representations made by the Staff in its Request, it is appropriate that the Staff continue its investigation into Respondents to determine if other violations of the Act and Rules have occurred.

ORDER

IT IS THERFORE ORDERED that VFG, LLC f/k/a Voyager Financial Group, LLC, Andrew Gamber, Kevin McNay, Robert Henry, and Jonathan Sheets, immediately cease and desist from any further actions in Arkansas in connection with the offer or sale of securities and any other violation of the Act or Rules.

The Staff shall continue its investigation to determine what, if any, other violations of the Act or Rules have occurred. This investigation should include the total amount and type of securities offered and sold by or through the agency of any of the Respondents or any associated or affiliated entities or persons as yet unknown, the methods used and representations made in connection with the offer and sale of securities and the disposition of any funds invested.

A hearing on this Order shall be held if requested by any party in writing within thirty

Page 12

Exhibit A
Page 39

days of the date of entry of this Order, or if otherwise ordered by the Commissioner. Such

request should be addressed to the Commissioner and submitted to the following address:

> Arkansas Securities Commissioner
> 201 East Markham, Suite 300
> Little Rock, Arkansas 72201

If no hearing is requested and none ordered by the Commissioner, this Order will remain

in effect until it is modified or vacated by the Commissioner pursuant to Ark. Code Ann. § 23-

42-209(a)(2)(B).

IT IS SO ORDERED.

A. Heath Abshure
Arkansas Securities Commissioner

April 22, 2013
Date

Exhibit A
Page 40

**EXHIBIT B**

MIKE BEEBE
GOVERNOR

A. HEATH ABSHURE
COMMISSIONER



HERITAGE WEST BUILDING, SUITE 300
201 EAST MARKHAM STREET
LITTLE ROCK, ARKANSAS 72201-1692
TELEPHONE: (501) 324-9260
FACSIMILE: (501) 324-9268

# ARKANSAS SECURITIES DEPARTMENT

## **FOR IMMEDIATE RELEASE**

Date: April 22, 2013
Contact Person:  Kaycee Wolf, Staff Attorney
501-683-0806

### ARKANSAS SECURITIES COMMISSIONER ORDERS VFG, LLC, ANDREW GAMBER, KEVIN MCNAY, ROBERT HENRY, AND JONATHAN SHEETS TO CEASE AND DESIST FROM VIOLATING THE ARKANSAS SECURITIES ACT

On April 22, 2013, Arkansas Securities Commissioner A. Heath Abshure ("Commissioner") entered a cease and desist order against VFG, LLC, f/k/a/ Voyager Financial Group, LLC ("VFG"), a Delaware limited liability company based in Little Rock, Arkansas; Andrew Gamber ("Gamber"); Kevin McNay ("McNay"); Robert Henry ("Henry"); and Jonathan Sheets ("Sheets").  The order directed the parties to stop the offer and sale of securities in Arkansas and to refrain from further activity in violation of the Arkansas Securities Act ("Act").

VFG facilitates the selling of future monthly payments of pension income streams for a lump sum.  An individual who wants to sell his or her income stream appoints VFG as an authorized buying agent to submit a contingent offer to a third-party buyer.  VFG then helps set up an escrow account where the income stream is directed and can be disbursed to the buyer.  VFG conducts pre-closing investigations and analyses, verifies all information is in place, verifies that there is a life insurance policy either purchased or collaterally assigned in case of the death of the seller, and provides all necessary paperwork to the buyers and sellers to facilitate the transactions.  As of August 20, 2012, VFG has facilitated approximately 317 sales in 31 states for an estimated total of $34,245,351.48 and received an estimated $6,724,049.71 in commissions.  VFG paid additional commissions to an estimated 81 agents between February 2011 and July 2012.  Multiple sales were made to two Arkansas residents during that time. Upon information and belief, VFG currently is facilitating sales and collecting commissions from transactions across the country.

The order found that secondary sales of income streams are considered investment contracts and therefore a security not properly registered or exempt pursuant to the Act.  The order also found that Gamber, McNay, Henry and Sheets had control of the company while it sold securities that were not registered or exempt under the Act.  Further, the Commissioner ordered a continued investigation for any other violations including possible fraud.

Anyone with additional information regarding VFG, Gamber, McNay, Henry, or Sheets is encouraged to contact Kaycee Wolf, Staff Attorney, at 501-683-0806.  The order is accessible online at the Department's website, www.securities.arkansas.gov, Order No. S-12-0015-13-OR01, *In the Matter of VFG, LLC f/k/a Voyager Financial Group, LLC, Andrew Gamber, Kevin McNay, Robert Henry, and Jonathan Sheets.*

Exhibit B
Page 41

**EXHIBIT C**

Don Howarth (SBN 53783)
dhowarth@howarth-smith.com
Suzelle M. Smith (SBN 113992)
ssmith@howarth-smith.com
Jessica L. Rankin (SBN 279237)
jrankin@howarth-smith.com
HOWARTH & SMITH
523 West Sixth Street, Suite 728
Los Angeles, California, 90014
Telephone: (213) 955-9400
Facsimile: (213) 622-0791

Stephen M. Garcia (SBN 123338)
sgarcia@lawgarcia.com
David M. Medby (SBN 227401)
GARCIA, ARTIGLIERE & SCHADRACK
One World Trade Center, Suite 1950
Long Beach, California 90831
Telephone: (562) 216-5270
Facsimile: (562) 216-5271

David T. Kupfer (SBN 97666)
dave@dtklaw.net
LAW OFFICES OF DAVID T. KUPFER
24586 Hawthorne Boulevard, Suite 110
Torrance, California 90505
Telephone: (310) 373-7770
Facsimile: (310) 373-7778

Attorneys for Plaintiff, Lawrence VICARI, individually
and on behalf of all others similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE VICARI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> VOYAGER FINANCIAL GROUP, LLC; VFG, LLC; BRANDON KOGUT; ANDREW GAMBER; BRITTNEY MCCLINTON; <br><br> —————————————————— <br><br> CAPTION CONTINUED ON NEXT PAGE | CASE NO. CV13-00671 <br><br> Assigned:  Hon. Audrey B. Collins <br> Courtroom:  680 <br><br> **CLASS ACTION** <br><br> **DECLARATION OF LEONARDO J. BERTUCCI** |

Exhibit C<br>Page 42      DECLARATION OF LEONARDO J. BERTUCCI

1   JONATHAN SHEETS; MACKENZIE
2   YOUNG,
3               Defendants.
4
5
6
7
8
9
10
11
12
13
14
15
16
17   / / /
18   / / /
19   / / /
20   / / /
21   / / /
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

Exhibit C

Page 43   DECLARATION OF LEONARDO J. BERTUCCI

## DECLARATION OF LEONARDO J. BERTUCCI

I, Leonardo J. Bertucci, declare as follows:

1. I am an Insurance agent in the state of California. As such, this declaration is made for the purpose of providing factual information concerning an investment in which I acted as an agent (within a distribution channel) for VFG, LLC and Voyager Financial Group, LLC, (hereinafter, VFG) for the sale of certain Veteran's disability payments to Lawrence Vicari. (These Veteran's disability payments were Coded by VFG as described below in paragraph 8). All facts stated herein are within my personal knowledge and I could testify thereto, if called to do so.

2. Prior to March of 2012, as part of my professional activities, I acted on behalf of VFG, through VFG's marketing organization, Mainline, to market VFG's products, including the sale of Veteran's Administration disability payments, to clients interested in making a purchase thereof.   My only role in this process, concerning Veteran's disability payments, involved locating interested parties who wanted to make a purchase and passing on information from VFG about the purchase.

3. This type of investment, through VFG, involved a cash purchase price by the investor/buyer (hereinafter, the "buyer") which would be offered to a disabled Veteran (hereinafter, sometimes the "seller") in exchange for the Veteran turning over his/her disability payments to the buyer.

4. In connection with these disability payments, I was given the following information, the source of which was VFG, which I was to use in marketing the investments:

      a.    it was legal to market and sell Veteran's disability payments.

      b.    these types of disability payment purchases were deemed very secure as they were backed by the strength of the U.S. Government, so that the Buyer's capital and a reasonable rate of return were assured.

      c.    that once the seller of the disability payments (the Veteran) signed the

Exhibit C
Page 44

1      agreements, there was little risk that the payments would stop as all

2              payments were to be forwarded to an escrow agent for disbursement.

3          5.  I trusted in the integrity and truthfulness of VFG in relying on these representations

4      and I conveyed them to my clients in marketing the purchases.   I had no reason to believe that

5      VFG's investments were not legal.

6          6.  In the event that I referred a Buyer to VFG, who then made a purchase of a disability

7      payment investment, I would eventually receive a commission from VFG, through VFG's

8      marketing organization, Mainline.

9          7.  In early 2012, I located Lawrence Vicari as in interested buyer for this type of VFG

10     disability purchase.  Once I located Mr. Vicari as an interested buyer and gave him the

11     information about the investment from VFG concerning the nature and security of the

12     investments, I then referred him to VFG, through VFG's agent, Mainline, as I was instructed to

13     do.

14         8.  In approximately March and April of 2012, Mr. Vicari made two purchases of these

15     Veteran's disability payment investments through VFG.  Specifically, in March of 2012,  Mr.

16     Vicari purchased disability payments from Jared Mitchell in the approximate amount of

17     $130,000.00 (VFG Coding # 1061) and in April of 2012,  purchased disability payments from

18     Gay High in the approximate of $62,000.00 (VFG Coding # 1503).

19         9.  Once I referred the VFG products to Mr. Vicari,  all agreements and documents, in

20     connection with these transactions, were provided by VFG and were on VFG letterhead.  No

21     documents in these transactions originated from either my office or Mainline,  nor were they on

22     my letterhead or that of Mainline.

23         10.  Once I located and then referred Mr. Vicari to VFG, I had no control or input over

24     the documents to be used in initiating or completing the transactions, I had no control or input

25     regarding the manner in which the transactions were to proceed or on the progress of the

26     transactions, I never had any contact with the sellers in either transaction, I had no control in the

27     selection of the escrow company or insurance companies selected to serve in the transactions,

28

Exhibit C
Page 45

1   and I had no control over the fees or commissions that VFG would receive as payment for their

2   services.

3          I declare under penalty of perjury that the foregoing is true and correct to the best of my

4   ability and recollection.  Executed on February 28th, 2013 at Torrance California.

5

6

7                                                                    Leonardo J. Bertucci, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit C
Page 46

# EXHIBIT D

APR-30-2012 05:27A FROM:                                      TO:18887706989        P.2/11

MAR-28-2012 02:46A FROM                                       TO:188.    3104    P.1/1



# SALES ASSISTANCE AGREEMENT

### (For Assistance in the Sale of Payments Derived from a Structured Asset)

This Sales Assistance Agreement (hereinafter referred to as the "Sales Assistance Agreement") is made effective this __28th__ day of __March__, 20__12__ (the "Effective Date"), by and between __Gay High__ ("Seller") and VFG, LLC, a Delaware limited liability company ("VFG").

## RECITALS

WHEREAS, Seller desires to sell certain fixed payments arising from a certain structured asset that have been distributed to and received by Seller (the "Payments") as described in this Sales Assistance Agreement;

WHEREAS, Seller desires to engage VFG to provide Seller with administrative assistance in connection with the sale of the Payments; and,

WHEREAS, VFG desires to accept such engagement subject to the terms and conditions contained in this Sales Assistance Agreement.

NOW THEREFORE, in consideration of the mutual covenants and benefits herein contained, the receipt and sufficiency is hereby acknowledged, Seller and VFG agree as follows:

### SECTION 1. SELLER'S AGENT

Seller appoints VFG as Seller's agent for the express, limited purpose of submitting a contingent offer for sale of the Payments ("Offer of Sale"), on Seller's behalf and under specified terms approved by Seller, to one or more third party potential buyer(s), the identities of which are to be provided to VFG by independent contractor(s); provided, however, that VFG shall not provide Seller with any form of legal or financial advice at any time, and further provided that such agency relationship shall immediately terminate upon the closing of a sale of the Payments, unless otherwise terminated as provided for herein.

### SECTION 2. DESCRIPTION OF PAYMENTS & UNDERLYING ASSET

The Payments to be offered for sale under this Sales Assistance Agreement, along with the underlying structured asset, are described as follows:

| | |
|---|---|
| Payee Name: | Gay High |
| Annuity Issuer: | VA |
| Annuity Policy Number: | 220664671 |
| Designated Payments: | 750/month 10 year |
| Purchase Price: | |
| Vendor Name: | Nick Perry |

**VALID.**

### (Signatures Contained on Following Page)

Page 2 of 3

Page 3 of 3

Sales Assistance Agreement

## SECTION 3. PAYMENT OF COMMISSION

Should a third party buyer accept the Offer of Sale and subsequently purchase the Payments, Seller shall pay to VFG a commission at the closing of such sale in consideration for the administrative assistance provided to Seller pursuant to this Sales Assistance Agreement.

## SECTION 4. POWER TO TERMINATE

Prior to acceptance by a third party buyer of the Offer of Sale, either party may terminate this Sales Assistance Agreement for any reason upon three (3) days written notice to the other party.

## SECTION 5. NO SALE OF PAYMENTS/RIGHT TO PURCHASE TO THIRD PARTIES

During the term of this Sales Assistance Agreement, Seller shall not sell or attempt to sell the Payments or a right to purchase the Payments to any third party.

## SECTION 6. NONCIRCUMVENTION

During the term of this Sales Assistance Agreement, Seller shall not circumvent nor attempt to circumvent VFG in any matter relating to this Sales Assistance Agreement, including, but not limited to, contacting or attempting to contact third party buyer(s).

## SECTION 7. ACKNOWLEDGEMENT OF RISKS

**SELLER AND VFG EXPRESSLY ACKNOWLEDGE AND AGREE TO THE FOLLOWING:**

**7.1. BOTH PARTIES INTEND THAT THE TRANSACTION(S) CONTEMPLATED BY THIS SALES ASSISTANCE AGREEMENT SHALL CONSTITUTE VALID SALE(S) OF PAYMENTS AND SHALL NOT CONSTITUTE IMPERMISSIBLE ASSIGNMENT(S), TRANSFER(S), OR ALIENATION OF BENEFITS BY SELLER AS CONTEMPLATED BY APPLICABLE LAWS; HOWEVER, CERTAIN RISKS EXIST.**

**7.2. BY EXECUTING THIS SALES ASSISTANCE AGREEMENT, SELLER ACKNOWLEDGES AND AGREES THAT SELLER IS AWARE OF AND EXPRESSLY ACCEPTS ALL RISKS ASSOCIATED WITH THE TRANSACTION(S) CONTEMPLATED HEREIN.**

**7.3. SELLER ACKNOWLEDGES AND AGREES THAT VFG MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING WHETHER A COURT OF LAW WOULD INTERPRET THE TRANSACTION(S) CONTEMPLATED HEREIN AS INVALID ASSIGNMENT(S), TRANSFER(S) OR ALIENATION OF BENEFITS, OR OTHERWISE DEEM THE TRANSACTION INVALID.**

**(Signatures Contained on Following Page)**

∫

Exhibit D
Page 48

Sales Assistance Agreement
_____

        IN WITNESS WHEREOF, the parties have executed this Sales Assistance Agreement as of the Ef-
fective Date.

                                    **"Seller"**

                                    _Gay High_____
                                    SIGNATURE

                                    Gay High
                                    _____
                                    PRINTED NAME

                                    Current Physical Address:
                                    _1112 Green St_____
                                    _Norfolk, VA 23513___


                                    Email: _Geebrown47@gmail.com_

                                    TEL: _757-737-9100_____

                                    **"VFG"**
                                    VFG, LLC, a Delaware Limited Liability Company

                                    By: _Chris N. Park_____

                                    Christian N. Parks
                                    _____
                                    PRINTED NAME

                                    Its:  Director of Compliance
                                    _____
                                          TITLE


_____
                                                        Page 3 of 3

                              Exhibit D
                              Page 49

**EXHIBIT E**



## PURCHASE APPLICATION

### (FOR THE PURCHASE OF PAYMENTS)

The "Payments" to be purchased pursuant to this Purchase Application are described as follows:

| | | | |
|---|---|---|---|
| Provider/Obligor: | VA Disability | Invoice Number: | VFG1503S |
| Payment Period: | monthly | Purchase Price: | $62,574.29 |
| Start Date: | 6/15/12 | Aggregate Value: | $90,000.00 |
| End Date: | 5/15/22 | Effective Rate of Return: | 8% |
| Payment Amount: | $750.00 | Distribution Channel: | The Bertucci Group, LLC |

### BUYER'S INFORMATION

| | |
|---|---|
| Social Security or EIN: | 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 |
| Name*: | Lawrence C. Vicari |
| Mailing Address: | 4717 Steele St.   Torrance  CA  90503 |
| Phone Numbers: | 310-662-3131  (cell.) |
| Email Address: | larryvicari@gmail.com |

LCV _____ By initialing here, I confirm that the address above is the Buyer's current mailing address

*__PLEASE BE ADVISED__: _If the above referenced case is being held inside of a custodial IRA; please make sure the custodial IRA ACCOUNT is set up prior to submission to ensure proper titling. Here is an example of proper titling for purchases being held inside of a custodial IRA: (Name of Custodial IRA company) FBO (Clients Name). You MUST complete the Buyers information using the custodial IRA's information._

A purchase of Payments is only suitable for persons who have the adequate financial means and who will not need immediate liquidity from this asset. There is no public market for this asset, and we cannot assure you that one will develop, which means that it may be difficult for you to sell your asset.

Buyer acknowledges and agrees that VFG is not providing, and does not provide, any legal, tax, financial, or other advice of any nature and recommends that Buyer consults his/her own professional advisor(s).

Buyer acknowledges that certain administrative fees (the "Fees") shall be included in the Purchase Price in order to effect the required transfers.

Buyers who have a registered IRA, Keogh, or Qualified Pension Plan may be eligible to purchase this asset through one of their qualified accounts. Neither VFG nor its affiliates or agents make any representations or assume any responsibility or liability to the account custodian, participants, Buyers, or beneficiaries thereof as to the tax ramifications of any such purchase, the suitability or

Exhibit E
Page 50

Ref. VFG1503S



eligibility of such purchase under the respective qualified account or plan, or that such purchase comports with Internal Revenue Service or other governmental rules and regulations pertaining to such accounts thereunder. A separate Direction of Investment form or similar documentation from the IRA Custodian is required for purchase through these types of accounts.

## LIFE CONTINGENCY

I understand that the purchase of Payments, which may be life contingent, requires the Seller to acquire a life insurance policy on the Seller, to be collaterally assigned to the Buyer to secure the Payments. To that end, I understand that there are different methods of paying the life insurance premiums. Among those methods are: (1) allowing VFG to facilitate the payments of premiums using an escrow company of VFG's choice to hold the full amount of the premiums and ensure the payments are made, or by any other method that VFG sees fit to use including purchasing a Single Premium Immediate Annuity for the policy, and (2) allowing the Seller to maintain the premiums.

**Please _carefully_ read the following and check the appropriate box below:**

**LCV** ____ By initialing this box I am requiring payment of the premiums on the collaterally assigned life insurance policy to be facilitated by VFG and serviced by the escrow company. I understand that the cost directly related to this service must be determined on a case by case basis and may reduce the rate at which this purchase takes place.

_____ By initialing this box, I am knowingly declining to have the insurance premiums facilitated by VFG through an escrow company and relying on the Seller to pay the life insurance premiums and keep the policy in effect. In the event the Seller allows the policy to lapse, the Buyer will be solely responsible for the contractual obligations related to this breach.

## TWO-YEAR CONTESTABILITY WRAPPER

I understand that a purchase of Payments, which may be life contingent, requires Seller to acquire a life insurance policy on the Seller, to be collaterally assigned to the Buyer to secure the Payments. To that end, I understand that newly issued life insurance policies provide for a two (2) year contestability period in which the insurance company may deny a claim on the basis of the insured's intent to defraud the insurance company through the suicide of the insured within the first two years of the policy's effective date. To remove this risk, VFG has made available for purchase, through Lloyd's of London, an insurance wrapper which covers that risk for this two-year contestability period.

**LCV** ____ By initialing this box, I am opting to purchase the two-year contestability wrapper for the current rate at the time of this purchase application. This price will be communicated to the Buyer before the two-year wrapper is purchased so that the Buyer may make an informed decision.

_____ By initialing this box, I am knowingly declining to purchase the two-year contestability wrapper which exposes this purchase to the risk mentioned above.

Buyer Signature: _____     Witness Signature: _____

Print Name: __Lawrence C. Vicari__     Print Name: __Leonardo J. Bertucci__

Date: __4/28/12__     Date: __4/28/12__

Agent: __Leonardo J. Bertucci__

Exhibit E
Page 51

Ref. VFG1503S





**EXHIBIT F**



## CONTRACT FOR SALE OF PAYMENTS

This Contract for Sale of Payments ("Contract for Sale") is made effective on the date of signing, by and between <u>Gay High</u>                                          ("Seller") and <u>Lawrence C. Vicari</u>                                    ("Buyer").

### RECITALS

WHEREAS, Seller desires to sell certain fixed payments arising from a certain structured asset that have been distributed to and received by Seller (the "Payments") as described in this Contract for Sale; and

WHEREAS, Buyer desires to purchase the Payments in accordance with the terms and conditions contained herein.

NOW THEREFORE, in consideration of the mutual covenants and benefits herein contained, the receipt and sufficiency is hereby acknowledged, Seller and Buyer agree as follows:

1.   Seller agrees to sell and Buyer agrees to purchase the Payments in accordance with, and subject to the terms and conditions of, this Contract for Sale.

2.   In connection with this Contract for Sale, Seller executed that certain Sales Assistance Agreement, executed by the Seller on __March__ 28 , 20 12 . Said Sales Assistance Agreement is incorporated herein by reference and made a part hereof, and all defined terms contained in said Sales Assistance Agreement shall have the same meaning when used herein, unless otherwise defined.

3.   The Payments that are the subject of this Contract for Sale, along with the underlying asset (the "Asset"), are more particularly described as follows:

- **Asset:** <u>VA Disability</u>

- **Life Contingent** ☐ Yes      ☐ No

- **Transaction Documents and Parties:**

  - o   **Name of Payee/Annuitant:** <u>Gay High</u>

  - o   **Underlying Payee Purchase Agreement: ON FILE**

  - o   **Annuity Contract/Benefit Letter: ON FILE**

  - o   **Annuity Issuer:** <u>VA Disability</u>

  - o   **Life Insurer:** <u>Fidelity Life</u>

  - o   **Life Insurance Policy:** <u>0100371049</u>

- **Description of Payments:** <u>120 monthly payments of $750.00: Start: 06/15/12; End: 05/15/22</u>

{8675309 FEC;4.03}                    Page 1 of 4              Contract for Sale of Payments

Exhibit F
Page 53



4. The servicer of the Payments for Seller and Buyer shall be <u>Security Title</u>
(the "Escrow Company") in accordance with the following:

- o The Payments will be serviced for the Seller by the Escrow Company in connection with the closing of the sale of the Payments (the "Closing"); provided, however, that the Asset shall remain the sole property of Seller and shall remain under the control of Seller.
- o The Payments will be serviced for the Buyer by the Escrow Company in accordance with an escrow agreement to be duly executed by and between Buyer and the Escrow Company in connection with the Closing.
- o By executing this Contract for sale, Seller and Buyer acknowledge receipt of the respective escrow agreements to be executed by each and confirm their agreement to the terms of same, relative to the servicing of the Payments.

- Other Miscellaneous Terms: _____

5. For the consideration described in the Sales Assistance Agreement, Seller shall transfer and sell to Buyer at Closing one hundred percent (100%) of Seller's right, title, and interest in and to the Payments; provided however, that the Asset shall remain the sole property of Seller and shall remain under the control of Seller.

6. Seller represents and warrants that, to the best of Seller's knowledge, all statements and information contained within the Sales Assistance Agreement concerning the Payments and the Asset were true as of the date of the Sales Assistance Agreement and have continuously remained true and correct in all respects through the date of this Contract for Sale, and further shall remain true and correct through the Closing.

7. Prior to Closing and continuing through the terms of this Contract for Sale, Seller shall acquire and maintain a valid life insurance policy with a payable on death provision in favor of Buyer in an amount not less than the total amount of the Payments sold pursuant to this Contract for Sale.

8. Beginning at Closing, Seller shall receive the Payments at a designated escrow account created in Seller's name and in effective control of Seller.

9. Seller shall grant the Escrow Company a Special Durable Power of Attorney in connection with Seller's escrow agreement enabling the Escrow Company to manage the escrow account and any Payments therein received, according to Seller's obligation in this Contract for Sale.

**10. ACKNOWLEDGMENT OF RISK. SELLER AND BUYER EXPRESSLY ACKNOWLEDGE AND AGREE TO THE FOLLOWING:**

**10.1 SELLER INTENDS TO ACTUALLY RECEIVE DISBURSEMENT OF EVERY PAYMENT DESCRIBED UNDER THIS CONTRACT FOR SALE, SELLER SHALL RETAIN AT ALL TIMES COMPLETE CONTROL OVER THE PAYMENTS AND THE UNDERLYING ASSET DESCRIBED HEREIN, AND SELLER INTENDS TO ASSIGN EVERY PAYMENT DESCRIBED HEREIN TO BUYER AFTER ACTUAL RECEIPT OF DISBURSEMENT.**



**10.2. BOTH PARTIES INTEND THAT THE TRANSACTION(S) CONTEMPLATED BY THIS CONTRACT FOR SALE SHALL CONSTITUTE VALID SALE(S) OF PAYMENTS AND SHALL NOT CONSTITUTE IMPERMISSIBLE ASSIGNMENT(S), TRANSFER(S), OR ALIENATION OF BENEFITS BY SELLERS AS CONTEMPLATED BY APPLICABLE LAWS; HOWEVER, CERTAIN RISKS EXIST.**

**10.3. BY EXECUTING THIS CONTRACT FOR SALE, BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT BUYER AND SELLER ARE AWARE OF AND EXPRESSLY ACCEPT ALL RISKS ASSOCIATED WITH THE TRANSACTION(S) CONTEMPLATED HEREIN.**

**10.4. BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT VFG MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING WHETHER A COURT OF LAW WOULD INTERPRET THE TRANSACTION(S) CONTEMPLATED HEREIN AS INVALID ASSIGNMENT(S), TRANSFER(S) OR ALIENATION OF BENEFITS, OR OTHERWISE DEEM THE TRANSACTION INVALID.**

*(Signatures Contained on Following Pages)*



IN WITNESS WHEREOF, the parties have executed this Contract for Sale as of the Effective Date.

| **SELLER:** | **BUYER:** |
|---|---|
| | *If an Individual:* |
| *[signature]* | Lawrence C. Vicari |
| Signature | Print Name(s) |
| | |
| **Gay High** | |
| Print Name | Signature(s) of Buyer |
| | |
| 4/30/12 | |
| Date: | Signature of Co-Buyer (if applicable) |
| | |
| | Date |
| | *If an Entity:* |
| | |
| | Name of Entity |
| | |
| | By: _____ |
| | |
| | Name: _____ |
| | |
| | Title: _____ |
| | |
| | Date: _____ |



IN WITNESS WHEREOF, the parties have executed this Contract for Sale as of the Effective Date.

| SELLER: | BUYER: |
|---|---|
| | *If an Individual:* |
| | Lawrence C. Vicari |
| Signature | Print Name(s) |
| | |
| Gay High | Signature(s) of Buyer |
| Print Name | |
| | N/A |
| | Signature of Co-Buyer (if applicable) |
| | 5/5/12 |
| Date: | Date |
| | *If an Entity:* |
| | N/A |
| | Name of Entity |
| | By: _____ |
| | Name: _____ |
| | Title: _____ |
| | Date: _____ |

**EXHIBIT G**

# SECURITY AGREEMENT

The undersigned Gay High _____ ,
("*Seller/Debtor*"), of 112 Green St. Norfolk, VA 23513 _____
(*Seller/Debtor's Address for notice*), hereby agrees and grants to and in favor of
Lawrence C. Vicari _____
(the "*Secured Party*") of 4717 Steele St. Torrance, CA 90503 _____
(*Secured Party's Address for Notice*), security interest as follows:

1.    In consideration of advances by the Secured Party to Seller/Debtor, directly or
indirectly, as principal, guarantor or otherwise, Seller/Debtor hereby grants and assigns to Secured
Party a continuing security interest in, lien upon, and a right of set-off against, all of Seller/Debtor's
right, title, and interest in and to the Collateral referred to in Paragraph 2 and defined in "Exhibit A"
hereof, to secure the prompt payment, performance, and observance of all indebtedness, obligations,
liabilities, and agreements of any kind of Seller/Debtor to the Secured Party, however evidenced,
arising under or in connection with the Agreement executed by Seller/Debtor in the principal amount
of $750.00 _____ monthly for a term in accordance with the Agreement which is incorporated herein
by reference and attached as "Exhibit B," and the prompt performance and observance of all other
obligations of Seller/Debtor to Secured Party. (All of the foregoing being herein referred to as the
"Obligations").

2.    The "Collateral" is defined as an account receivable, more fully described in Exhibit
"A" hereto. By these premises Seller/Debtor agrees and consents to the pledge of the Collateral as
security for the Agreement.

3.    Seller/Debtor warrants, represents and covenants that:

(a)    the state, or commonwealth, where Seller/Debtor resides and the books and records relating to
the Collateral is, Virginia _____ ;

(b)    except for those in favor of Secured Party, the Collateral is now, and at all times will be, will be
subject to the right of Seller/Debtor to receive free and clear of all liens, security interests, claims, and
encumbrances except as otherwise authorized in this Security Document.

(c)    the Seller/Debtor will not assign, sell, lease, transfer, or otherwise dispose of or abandon, nor
will Seller/Debtor suffer or permit any of the same to occur with respect to, the Collateral, and the
inclusion of "proceeds" of the Collateral under the security interest granted herein shall not be deemed
a consent by Secured Party to any sale or other disposition of any Collateral;

(d)    at any time and from time to time, Seller/Debtor at its sole cost and expense will execute and
deliver to Secured Party such financing statements pursuant to the Uniform Commercial Code ("UCC")
as enacted in the state, or commonwealth, of Virginia _____ (*Seller/Debtor's State*),
applications for certificate of title and other papers, documents, or instruments as may be reasonably
requested by Secured Party in connection with this Security Agreement and to the extent permitted by
applicable law, the Seller/Debtor hereby authorizes Secured Party to execute and file at any time and
from time to time one or more financing statements, including a UCC-1;

(e)    Seller/Debtor assumes all responsibility and liability arising from the use, by Seller/Debtor, of
the Collateral;

(f)    after the occurrence and during the continuation of a Default, any proceeds of the Collateral
received by the Seller/Debtor shall not be commingled with other property of the Seller/Debtor, but
shall be segregated, held by the Seller/Debtor in trust for Secured Party, and immediately delivered to
Secured Party in the form received, duly endorsed in blank where appropriate to effectuate the
provisions hereof, the same to be held by Secured Party as additional Collateral hereunder or, at
Secured Party's option, to be applied to payment of the obligations, whether or not due and in any
order.

4.    For purposes of this Security Agreement, "Default" shall be defined herein as, but not
limited to:

Page 1 of 3

(a) the failure of Seller/Debtor, whether willful or not, to comply with any covenant, affirmative or negative, securing the Agreement to Secured Party;

(b) interference with, interruption of, or diminishment of, or allowing or causing any third party to interfere with, interrupt, or diminish, the cash flow as designated in the Agreement to the Secured Party, unless specifically authorized by Secured Party in writing;

(c) or any other default under any such other documents.

     5.     After the occurrence and during the continuation of any Default, Secured Party shall have the following rights and remedies (to the extent permitted by applicable law) in addition to all rights and remedies of a secured party under the UCC or otherwise (whether at law or in equity), all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently:

(a) Secured Party may, with or without judicial process or the aid and assistance of others to the extent permitted by applicable law,

     (i) require Seller/Debtor to assemble and make available to Secured Party at the expense of the Seller/Debtor, any part or all of the Collateral.

     (ii) remove any part or all of the Collateral from any account or premises for the purpose of disposition thereof.

(b)Secured Party may at any time and from time to time during the continuance of a Default, appropriate, set off and apply to the payment of the Obligations, any Collateral in or coming into the possession of Secured Party without notice to Seller/Debtor and in such manner as Secured Party may in its discretion determine.

     6. Seller/Debtor hereby designates and appoints Secured Party and each of its designees or agents as attorneys-in-fact of the Seller/Debtor, irrevocably and with power of substitution, with authority, after the occurrence and during the continuation of a Default, and upon reasonable notice to Seller/Debtor of the existence of such Default, to adjust and compromise any claims under insurance policies or otherwise. All acts done under the foregoing authorization (except those which constitute gross negligence or willful misconduct by Secured Party) are hereby ratified and approved, and neither Secured Party, nor any designee or agent thereof, shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law except for any of the foregoing arising solely from the gross negligence or willful misconduct of Secured Party. This power of attorney being coupled with an interest is irrevocable while any Obligations shall remain unpaid and shall terminate upon all Obligations being satisfied.

     7.     Seller/Debtor hereby releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security Agreement, the Collateral and its use and/or any actions taken or omitted to be taken by Secured Party with respect thereto other than those arising solely from the gross negligence or willful misconduct of Secured Party, and Seller/Debtor hereby agrees to hold Secured Party harmless from and with respect to any and all such claims, causes of action and demands.

     8.     Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations nor shall any demand, suit or proceeding for payment or collection on the Obligation constitute a condition of any recourse by Secured Party to the Collateral. Any suit or proceeding by Secured Party to recover under the Obligation shall not be deemed a waiver of or bar against subsequent proceedings by Secured Party with respect to any other outstanding Obligations and/or with respect to the Collateral. No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise. No single or partial waiver by Secured Party of any covenant, warranty, representation, Default or right or remedy which it may have shall operate as a waiver of any other covenant, warranty, representation, Default, right or remedy or of the same covenant, warranty, representation, Default, right or remedy on a future occasion. Seller/Debtor hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing any Obligations or Collateral, and all other notices and demands whatsoever (except as may be expressly provided herein).

**Page 2 of 3**

9.      The Seller/Debtor hereby irrevocably consents to the jurisdiction of the courts of the state of (insert buyers address) and of any federal court located in such state in connection with any action or proceeding arising out of or relating to this Security Agreement or the Collateral, or any document or instrument delivered with respect to the Obligation. Seller/Debtor waives the defenses of forum nonconveniens and improper venue. Seller/Debtor hereby waives personal service of any process in connection with any such action or proceeding and agrees that the service thereof may be made by certified or registered mail directed to Seller/Debtor at the personal residence of Seller/Debtor set forth in this Security Agreement.

12.     Upon the performance by Seller/Debtor in full of its entire Obligation, the security interest created hereunder shall terminate and all rights to the Collateral shall revert to Seller/Debtor.

13.     All terms herein shall have the meanings as defined in the UCC, unless the context otherwise requires. No provision hereof shall be modified, altered, waived, released, terminated or limited except by a written instrument expressly referring to this Security Agreement and to such provision, and executed by the party to be charged. The execution and delivery of this Security Agreement has been authorized by Seller/Debtor. This Security Agreement and the Obligations shall be governed in all respects by the laws of the state, or commonwealth, of __Virginia__ (Seller/Debtor's State) applicable to contracts executed and to be performed in such state. If any term of this Security Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby. Seller/Debtor acknowledges receipt of a copy of this Security Agreement.

14.     **THIS SECURITY AGREEMENT** is in addition to, and not in lieu, replacement, or substitution of, any and all prior agreements from Seller/Debtor to Secured Party.

**IN WITNESS WHEREOF,** the undersigned has executed or caused this Security Agreement to be executed as of the date first above set forth.

**SELLER/DEBTOR:** Gay High
                        *(Print Name)*,

**SIGNED:** _Gay High_
            *(Signature of Seller/Debtor)*

**ACKNOWLEDGMENT**

STATE OF __Virginia__

COUNTY OF __Norfolk__     ss: 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

        BE IT REMEMBERED that on this day came before me, the undersigned Notary Public, within and for the County and State aforesaid, duly commissioned, qualified and acting, __Gay High__, who acknowledged that he/she is the Seller/Debtor of this Security Agreement, duly authorized in his/her respective capacity to execute the foregoing instrument, and further stated and acknowledged that he/she has so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

        DATED this __30__ day of __April 2012__

My Commission Expires: __March 31, 2014__     Notary Public _Mounia Tai Herbert_

MOUNIA TAI HERBERT
Notary Public
Commonwealth of Virginia
Registration No. 7379094

Page 3 of 3

# EXHIBIT A

## DESCRIPTION OF COLLATERAL

The Collateral is the right to receive the income stream in the amount of $ 750.00     ; associated with Account/Annuity # XXXXX4671          with VA Disability                              ; payable monthly as an account receivable. The security interest in this collateral attaches after the funds have been disbursed from VA Disability                          to Seller/Debtor and immediately upon receipt of the Seller/Debtor of these specific funds in any form, fashion, account, or location; and after the funds have left the purview of any ERISA regulated organization.

# EXHIBIT H



## OFFER OF SALE OF PAYMENTS

VFG, LLC ("__VFG__") hereby submits to Lawrence C. Vicari _____ ("__Buyer__") this Offer of Sale of Payments ("__Offer of Sale__"), made effective this _5th_ day of _MAY_ , 20 _12_ (the "__Effective Date__").  Pursuant to this Offer of Sale, Buyer may offer to purchase certain fixed payments arising from a certain structured asset that have been distributed to and received by a seller (the "__Payments__") as described in this Offer of Sale.

The Payments that are the subject of this Offer of Sale, along with the underlying asset (the "__Asset__") are more particularly described as follows:

| Payee Name: | Gay High |
|---|---|
| Annuity Issuer: | VA Disability |
| Annuity Policy Number: | 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 |
| Aggregate Payments: | $90,000.00 |
| Purchased Payments: | 120 Monthly Payments of $750.00 Start: 06/15/2012 |
| Purchase Price:[†] | $62,574.29 |
| Effective Interest Rate: | 8.000% |

### Terms of Purchase and Sale of Payments

1. Buyer and VFG have previously executed that certain Purchase Assistance Agreement, made effective _MAY_ , _5_ , 20 _12_  Said Purchase Assistance Agreement is incorporated herein by reference and made a part hereof, and all defined terms contained in said Purchase Assistance Agreement shall have the same meaning when used herein, unless otherwise defined.

2. The Purchase Price shall be paid in legal US Dollars and payable to VFG, LLC (the "__Buying Agent__") for the benefit of Seller and delivered to the following address:

VFG, LLC
1431 Merrill Dr. Ste. H
Little Rock, Arkansas 72211

3. The Closing shall occur at a date to be determined, which shall be no later than sixty (60) days after the Effective Date of this Offer of Sale.

4. Buyer affirms and agrees that this Offer of Sale applies only to a purchase of the Payments and that the Asset shall remain the sole property of Seller and under Seller's control.

5. Upon satisfaction of all terms and conditions of the Purchase Assistance Agreement, and a minimum of three (3) days prior to Closing, VFG shall deliver the Closing Book to the Buyer, or its designated agent, as designated by the Buyer in writing to VFG.

---

[†] This is an estimated price as of the projected day of funding.  Actual Purchase Price will be calculated using the stated effective interest rate and shall be calculated as of the actual day of funding.

_Initials_

Page 1 of 3



6. As an express condition of Closing, the Buyer shall have in its sole and absolute discretion, the right to review the Closing Book and verify information contained therein. The Buyer shall have three (3) business days from the date of receipt of the Closing Book to notify VFG in writing of any objection(s) to the contents of the Closing Book. If Buyer fails to notify VFG in writing of any objection(s) within said three (3) day period, then the Closing Book shall be deemed accepted by Buyer and all objections shall be deemed to have been waived by Buyer. If Buyer notifies VFG in writing of an objection within said three (3) day period, VFG shall have up to forty-five (45) business days ("Cure Period") from the date of VFG's receipt of notice of objection to cure said objection(s); or in the alternative, VFG in its sole and absolute discretion shall have the right to terminate this Offer of Sale at any time during the Cure Period without penalty to VFG.

The Buyer shall have three (3) business days from the end of the Cure Period to notify VFG in writing of any objection(s) to VFG's efforts to cure. If Buyer fails to notify VFG in writing of any objection(s) within said three (3) day period, then the cure shall be deemed accepted by Buyer and all objections shall be deemed to have been waived by Buyer. If Buyer notifies VFG in writing of an objection within said three (3) day period, VFG shall have the right to terminate this Offer of Sale immediately without penalty to VFG.

If VFG is unwilling or unable to cure said objection(s) within the Cure Period, then this Offer of Sale shall terminate at the end of the Cure Period without penalty to VFG or to Buyer.

If this Offer of Sale terminates for any reason under this Paragraph 6, Buyer hereby authorizes and provides VFG with power of attorney to take any steps necessary to reassign the Offer of Sale to another investor and/or Buyer.

7. In the event that Buyer defaults on the Purchase Assistance Agreement and/or this Offer of Sale, VFG shall be entitled to retain an amount not to exceed ten percent of the monies held in escrow as liquidated damages, in addition to all other remedies to which VFG may be entitled.

*(Signatures Contained on Following Page)*

Initials

Page 2 of 3

Exhibit H
Page 63



IN WITNESS WHEREOF, the parties have executed this Offer of Sale as of the Effective Date.

**"Buyer"**

_____
Signature

Lawrence C. Vicari
_____
Printed Name

Current Physical Address:
4717 Steele St.
_____

Torrance, CA 90503
_____

Email: _LARRY VICARI @gmail.com_

Telephone: _(310) 662-3131 (cell)_


**"VFG"**

VFG, LLC, a Delaware Limited Liability Company

By: _____

Printed Name:  Christian N. Parks
_____

Its:  Director of Compliance
_____

_____
Initials

# EXHIBIT I



# PURCHASE ASSISTANCE AGREEMENT

This Purchase Assistance Agreement is made effective this **5th** day of **MAY**, 20**12** (the "Effective Date"), by and between VFG, LLC, a Delaware limited liability company ("VFG") and **Lawrence C. Vicari** ("Buyer").

## RECITALS

WHEREAS, from time to time, VFG enters into Sales Assistance Agreements with individuals (the "Seller(s)") who desire to sell certain fixed payments which have been distributed to and received by the Sellers from certain structured assets (the "Payment(s)") in exchange for a discounted lump sum payment;

WHEREAS, Buyer desires to purchase such Payments as provided in this Purchase Assistance Agreement;

WHEREAS, Buyer desires to engage VFG to provide Buyer with administrative assistance in connection with the purchase of the Payments; and

WHEREAS, VFG desires to accept such engagement subject to the terms and conditions contained in this Purchase Assistance Agreement.

NOW THEREFORE, in consideration of the mutual covenants and benefits herein contained, the receipt and sufficiency is hereby acknowledged, Buyer and VFG agree as follows:

**1.  Price Quote and Escrow.**  Pursuant to this Purchase Assistance Agreement, VFG shall endeavor to deliver to Buyer, from time to time, an Offer of Sale on behalf of a Seller.  Such Offer of Sale will describe certain Payments for sale at that time and provide Buyer an opportunity to offer to purchase such Payments.  If Buyer desires to purchase such Payments described in the Offer of Sale, the Buyer shall execute a Purchase Application provided to Buyer by VFG and return the signed Purchase Application to VFG.  If VFG, on behalf of the Seller, accepts Buyer's offer for purchase as set forth in the Purchase Application, VFG shall notify Buyer as indicated in the Purchase Application.  Pursuant to closing of the purchase of the Payments, the Buyer shall, as directed in the Purchase Application, deposit into an escrow account, subject to the terms and conditions of the Purchase Application, an amount equal to the Buyer's offer as indicated in the Purchase Application.

**2.  Contract for Sale of Payments.**  In connection with the purchase of Payments, Buyer and Seller shall be required to execute a Contract for Sale of Payments, pursuant to Schedule A of this Agreement (the "Contract for Sale"). The Contract for Sale shall include a description of the Payments to be sold to Buyer along with a description of the asset underlying the Payments.

**3.  Closing and Payment.**

**3.1  Closing.**  The closing of each purchase and sale of Payments (the "Closing") shall occur upon the completion of all of the following:  (1) funding into escrow by the Buyer (as described herein); (2) delivery to and receipt by the Buyer of a complete closing book (the "Closing Book") as described in Schedule A of this Purchase Assistance Agreement; (3) funds in the amount of the purchase price for the Payments (the "Purchase Price") are paid and delivered to the Seller; and (4) funds in the

Initials

Exhibit I
Page 65



amount of the Commission (hereinafter defined) are delivered to VFG.

3.2 Conveyance. Upon distribution from escrow of the funding amount set forth in the Purchase Application, the transaction between Seller and Buyer shall constitute a final sale, grant, transfer and conveyance by Seller to Buyer of all of Seller's rights and interest in, to, and under the Payment(s); provided, however, that the underlying asset shall remain the sole property of Seller and under the control of Seller.

3.3 Price and Payment. The Purchase Price set forth in each Contract for Sale shall be paid in accordance with the funding instructions mutually agreed upon by the parties to this Purchase Assistance Agreement and as provided in the Closing Book. It is agreed that the "Commission" to VFG shall be calculated, on the day of funding, from a pre-negotiated discount rate.

3.4 Time is of the Essence. Buyer acknowledges that time is of the essence in this transaction with respect to all provisions of this Purchase Assistance Agreement that specify a time for performance and **unreasonable delay may constitute a breach of this agreement**; provided, however, that the foregoing shall not be construed to limit or deprive a party of the benefits of any grace or use period allowed in this Purchase Assistance Agreement.

4. **Non-Circumvention.**

4.1 For a period of five (5) years from the Effective Date of this Purchase Assistance Agreement, Buyer shall refrain from soliciting business or contracts from sources not their own which have been made available to Buyer either by or through VFG or resulting from the efforts of VFG or VFG's employees, contractors, or agents, without the express written permission of VFG. In addition, all parties to this Purchase Assistance Agreement, including but not limited to, signatories, affiliates, subsidiaries, partners, relatives, heirs, successors, assigns, and agents to all of the parties to this Purchase Assistance Agreement will maintain complete confidentiality regarding the information, aspects, terms, and conditions of the Contract(s) for Sale, the Payment(s), and Purchase Application, and, unless required by law, will only disclose such information (other than to the party's attorneys, auditors, vendees, investors, senior managers, or such employees whose knowledge is required to carry out the terms of this Purchase Assistance Agreement) under mutual written agreement with the other party, and only after written permission has been received from the originator of the source.

4.2 The Buyer and VFG further agree not to enter into business transaction(s) with banks, investors, brokers, co-brokers, sources of funds or other bodies, the names of which have been provided by either party, unless written permission has been obtained from the other party, or parties, to do so. For the sake of this Purchase Assistance Agreement, it does not matter whether the information is obtained from a natural or a legal person. The Buyer also undertakes not to make use of a third party to circumvent this Purchase Assistance Agreement.

4.3 In the event of circumvention of this Purchase Assistance Agreement by the Buyer or VFG, directly or indirectly, the circumvented party shall be entitled to damages equal to the maximum service it should realize from such a transaction plus any and all expenses, including but not limited to all reasonable legal fees and expenses incurred to recover the lost revenue.

5. **Cooperation by VFG.** VFG shall cooperate with the Buyer to instruct and notify the escrow company identified in the Contract for Sale to make the Payment(s) to Buyer in accordance with the terms of this Purchase Assistance Agreement. VFG shall direct all appropriate parties that such payments, if check or note, are to be made payable to and sent to:

Initials

Purchase Assistance Agreement FECv.3.5

Exhibit I
Page 66



Lawrence C. Vicari

4717 Steele St.

Torrance, CA 90503

6. **Administrative Assistance.** Buyer and VFG desire, acknowledge, and agree that in connection with Buyer's purchase of the Payments, VFG shall provide to Buyer only administrative assistance, and VFG shall not provide to Buyer legal or financial advice or assistance of any kind whatsoever.

7. **ACKNOWLEDGMENT OF RISK.** BUYER AND VFG EXPRESSLY ACKNOWLEDGE AND AGREE TO THE FOLLOWING:

7.1. BOTH PARTIES INTEND THAT THE TRANSACTION(S) CONTEMPLATED BY THIS PURCHASE ASSISTANCE AGREEMENT SHALL CONSTITUTE VALID SALE(S) OF PAYMENTS AND SHALL NOT CONSTITUTE IMPERMISSIBLE ASSIGNMENT(S), TRANSFER(S), OR ALIENATION OF BENEFITS BY SELLERS AS CONTEMPLATED BY APPLICABLE LAWS; HOWEVER, CERTAIN RISKS EXIST.

7.2. BY EXECUTING THIS PURCHASE ASSISTANCE AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS AWARE OF AND EXPRESSLY ACCEPTS ALL RISKS ASSOCIATED WITH THE TRANSACTION(S) CONTEMPLATED HEREIN.

7.3. BUYER ACKNOWLEDGES AND AGREES THAT VFG MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING WHETHER A COURT OF LAW WOULD INTERPRET THE TRANSACTION(S) CONTEMPLATED HEREIN AS INVALID ASSIGNMENT(S), TRANSFER(S) OR ALIENATION OF BENEFITS, OR OTHERWISE DEEM THE TRANSACTION INVALID.

8. **Wiring of Funds.** The Buyer and VFG acknowledge that the escrow agent cannot electronically transfer or wire funds later than 2:00 PM Central Time and that both the Buyer and VFG's obligations to each other must be completed in sufficient time in order to allow mailing of documents and wiring of funds.

9. **Assumption.** Subject to the terms and conditions of this Purchase Assistance Agreement, and in accordance with the Contract for Sale, the Buyer shall accept the conveyance of the Payments described in the Contract for Sale, and shall also assume, perform, pay, and discharge all of the duties, liabilities, and obligations required under the Contract for Sale.

10. **Entire Agreement.** Neither party has been induced to enter into this Purchase Assistance Agreement by any covenant, representation, or warranty not specifically set forth herein. This Purchase Assistance Agreement supersedes all prior agreements, arrangements and understandings, whether oral or written, and all other communications between Buyer and VFG concerning the subject matter hereof. No modification, waiver, release, rescission, or amendment of any provision of this Purchase Assistance Agreement shall be made except by a written instrument duly executed by each of the parties hereto.

11. **Binding Effect.** This Purchase Assistance Agreement shall inure to the benefit of and be binding upon VFG, the Buyer, and their respective successors, heirs, and assigns.

Initials



**12. Severability.** Any invalid or unenforceable provision shall be deemed severed from this Purchase Assistance Agreement to the extent of its invalidity or unenforceability, and the remainder of this Purchase Assistance Agreement shall remain in full force and effect.

**13. Counterparts.** This Purchase Assistance Agreement may be executed in two or more counterparts which, when taken together, shall be deemed an original and constitute one and the same document. Facsimile transmission of executed signature pages shall be sufficient to bind the executing party.

**14. Confidentiality.** VFG and the Buyer agree that the contents of this Purchase Assistance Agreement shall remain confidential, and shall not be disclosed to any person or entity (other than the party's attorneys, auditors, vendees, investors, senior managers, or such employees whose knowledge is required to carry out the terms of this Purchase Assistance Agreement) except as may be required by law and upon reasonable notice to the parties.

**15. Section Headings.** Section headings contained in this Purchase Assistance Agreement are inserted for convenience or reference only and shall not be deemed to be a part of this Purchase Assistance Agreement for any purpose, and shall not in any way define or affect the meaning, construction, scope of any of the provisions hereof.

**16. Governing Law.** This Purchase Assistance Agreement shall be construed according to the laws of the State of Arkansas, without regard to choice of law principles.

## *INITIAL THE BOTTOM OF EACH PAGE BEFORE SUBMISSION*

*(Signatures Contained on Following Pages)*

<u>Initials</u>

Purchase Assistance Agreement FECv.3.5

Page 4 of 6

Exhibit I
Page 68



IN WITNESS WHEREOF, the parties have executed this Purchase Assistance Agreement as of the Effective Date.

"Buyer"

_____
Signature

Lawrence C. Vicari
_____
Printed Name

Current Physical Address:
4717 Steele St.
_____

Torrance, CA 90503
_____

Email: _LARRYVICARI@GMAIL.com_

Telephone: _(310) 662-3131 (cell)_


"VFG"

VFG, LLC, a Delaware Limited Liability Company

By: _____

Printed Name: Christian N. Parks
_____

Its: Director of Compliance
_____


Initials

Exhibit I
Page 69

Name & Address:  Don Howarth, Suzelle M. Smith,
Jessica Rankin, Howarth & Smith, 523 W. Sixth
Street, Suite 728, Los Angeles, CA 90014, (213)
955-9400

See attachment.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Lawrence Vicari, individually and on behalf of all others similarly situated,<br><br><br>PLAINTIFF(S)<br>v. | CASE NUMBER<br><br>CV13-00671-ABC (RZx) |
|---|---|
| Voyager Financial Group, LLC; VFG, LLC; Brandon Kogut; Andrew Gamber; Brittney McClinton; Jonathan Sheets; Mackenzie Young,<br><br>DEFENDANT(S). | **SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ ____Second____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Suzelle M. Smith_____ , whose address is _523 W. Sixth Street, Suite 728, Los Angeles, CA 90014_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: May 8, 2013

By: _Rhonda Marshael_

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

NAME & ADDRESS continued

Stephen M. Garcia, David M. Medby, Garcia, Artigliere & Schadrack, One World Trade Center, Suite 1950, Long Beach, California 90831, (562) 216-5270
David T. Kupfer, Law Offices Of David T. Kupfer, 24586 Hawthorne Boulevard, Suite 110, Torrance, California 90505, (310) 373-7770